[Cite as *Frost v. Evenflo Co., Inc.*, 2023-Ohio-4561.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

KRISTINA RENE FROST, AND GARY : 
ALLEN MAYS, :
Individually and as Co-Personal : C.A. No. 2022-CA-29
Representatives of the :
Estates of SHAWNA RENE MAYS, : Trial Court Case No. 20 CV 109
AND TRISTAN ALLEN MAYS, :
Deceased : (Civil Appeal from Common Pleas
 : Court)
      Appellants :
 :
v. :

EVENFLO COMPANY, INC.

      Appellee

. . . . . . . . . . .

O P I N I O N

Rendered on December 15, 2023

. . . . . . . . . . .

JONATHAN S. ZWEIZIG, Attorney for Appellant Gary Allen Mays

A. VINCE COLELLA, pro hac vice, Attorney for Appellant Gary Allen Mays

KRISTINA RENE FROST, Appellant, Pro Se

TIMOTHY R. BRICKER, JOEL E. SECHLER, GREGORY R. DICK and SIMON J. PATRY, Attorneys for Appellee

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} This matter is before the court on the appeal of Plaintiff-Appellants Kristina Rene Frost ("Kristina") and Gary Allen Mays, individually and as co-personal representatives of the Estates of Shawna Rene Mays and Tristan Allen Mays, deceased, who tragically died in a car fire.[1]  Appellants appeal the summary judgment that the trial court granted in favor of Defendant-Appellee Evenflo Company, Inc. ("Evenflo"), which manufactured the car seat in which one child was seated.  Appellants alleged the car seat had a defective crotch buckle that failed to properly release and resulted in Kristina's inability to rescue both of the children from the fire.

{¶ 2} According to Appellants, the trial court erred in granting summary judgment as to the proximate case of the injuries to Tristan and Shawna.  Appellants further contend the court erred in applying the "sham affidavit" rule and striking the affidavits of their medical experts, because the affidavits were not submitted for purposes of defeating summary judgment but were prepared in accordance with the court's scheduling order. In addition, Appellants argue the court erred in granting summary judgment on the children's pain and suffering, additional injuries, and ultimate deaths, because expert testimony was not needed for a reasonable jury to find that the children had experienced conscious pain and suffering when they were on fire.  Finally, Appellants maintain the court erred in limiting their "failure to warn" claim to contamination of the buckle mechanism and in rendering summary judgment on that ground.

{¶ 3} For the reasons discussed below, we conclude that the trial court did not err

---

[1] Because some involved individuals have the same last names, we will use first names when referring to the adult plaintiffs and their deceased children.  Where necessary, we will use "Appellants" collectively.

in rendering summary judgment against Appellants. There were no genuine issues of material fact concerning whether the alleged defect in Evenflo's car seat proximately caused the injuries and deaths of Shawna and Tristan, and the court did not err in granting summary judgment on this ground. The court also did not err in rejecting affidavits of Appellants' medical experts under the sham affidavit rule. The affidavits contradicted or were inconsistent with the experts' previous testimony, and the experts did not sufficiently explain the reasons for the contradictions.

**{¶ 4}** Furthermore, Appellants' argument that expert testimony was not needed to demonstrate conscious pain and suffering is not well-taken. In this context, Appellants simply repeated the causation arguments they made to try to show that the alleged car seat defect proximately caused the children's injuries and deaths. While causation is generally a factual question for the jury, a plaintiff must present some evidence of causation before the question may be submitted to jurors. The fact that injuries may be obvious in certain situations is not the same as concluding, therefore, that an opposing party's acts proximately caused those injuries.

**{¶ 5}** Finally, given the failure of their other arguments, Appellants' claims about the court's decision on their failure to warn claim are moot. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 6}** The claims in this case arose from a July 3, 2018 car fire which resulted in the tragic deaths of Appellants' children, Shawna and Tristan. At the time, both children

were seated in the second row seats of a 2004 Buick Rendezvous that their mother, Kristina, was driving. Shawna, age five, was sitting on the driver's side behind Kristina, and Tristan, age two, was on the passenger side, seated in an Evenflo Titan 65/SureRide Car Seat ("SureRide").

{¶ 7} The incident will be discussed in more detail later, but as general background, Kristina left her home in Lenoir, North Carolina around 5:00 or 6:00 p.m. on July 3, 2018. Kristina Frost Deposition, 25-26. Kristina was going to Western North Carolina for an annual fireworks celebration she and her friends held every year. *Id.* at 26. Kristina had purchased the Rendezvous a few weeks earlier and had experienced some issues with the acceleration and it "bogging out." *Id.* at 43.

{¶ 8} During the trip, which normally took about two hours and involved mountain driving, Kristina had to stop twice because she was having trouble getting acceleration. At those times, she exited the highway, turned off the car, and restarted it. *Id.* at 46-49. After Kristina had summited Balsam Mountain and was on the downgrade on westbound U.S. 23/74 (a four-lane, limited access highway), a driver in another car began flashing its lights at her and telling her to pull over. *Id.* at 50 and 52, and Sgt. Dietz Deposition, 41-42.

{¶ 9} As soon as Kristina pulled over, she put the car in park and saw smoke coming out of the front end of the car. When Kristina opened her door, flames outside the car were already higher than she was (five feet, eight inches). Kristina ran to Shawna's door, opened the car door, and spent seconds trying to unlatch Shawna's seat belt. However, Kristina was unable to do so because she (Kristina) caught fire. Kristina

Depo. at 54, 56, and 64. Kristina immediately ran to the grass behind the car, rolled herself out three or four times to extinguish the fire, and then ran to Tristan's door. She opened the door and tried to unbuckle Tristan's seat but was unable to get the button on the buckle to depress. Kristina once more caught fire and had to run away and roll herself out again. *Id.* at 65-67 and 124-125. According to Kristina, there were no flames inside the vehicle when she went to Tristan's side the first time; flames were underneath the vehicle on that side. However, after she opened Tristan's door and had to run away, the flames entered inside the vehicle and Tristan caught fire. *Id.* at 67 and 74-76.

{¶ 10} At some point, Shawna unlocked herself and got out of the vehicle. When Kristina rolled herself out the second time, she saw Shawna walking toward her, completely burned and black, with no hair or skin. *Id.* at 62, 65, and 73-74. By the time Kristina attempted to run back to Tristan, his body "exploded" from the vehicle and landed on the ground. *Id.* at 74. Tristan was pronounced dead at the scene; Shawna was eventually airlifted to Wake Forest Baptist Hospital, where she died the next morning. Shawna had sustained full-thickness (or third-degree) burns, which are the most severe, over 81% of her body and partial-thickness (or second-degree) burns over 18% of her body. Kristina had sustained 25% total body surface area partial and full-thickness burns to her face, bilateral arms, bilateral legs, and bilateral feet, and was hospitalized for about two months. *Id.* at 104; Dr. Khandelwal Deposition, 58; Ex. 41 (August 19, 2022 Affidavit of Dr. Khandelwal) and attached May 2, 2022 Khandelwal Expert Report, FROST-400346 (attached to Plaintiff's Response to Evenflo's Motion for Summary Judgment ("Plaintiffs' Response"); Cameron Taylor Deposition, 91; Anthony Soop Deposition, 73; Trooper

Sawyer Deposition, 97 and 101-102; Tammy Frost Deposition, 84; Dr. Bernal Deposition, 64-65; and Ex. 3 to the Bernal Deposition.

{¶ 11} Following the incident, Appellants filed a complaint against Evenflo on March 18, 2020, alleging negligence and gross negligence in the design, manufacture, and warning of defects in the car seat, and more particularly in the crotch buckle located on the seat harness. Appellants also included a product liability claim; a fraud claim for nondisclosure of material facts concerning the allegedly defective crotch buckle; fraud and misrepresentation claims based on concealment of material facts and representations concerning the buckle; wrongful death claims; survival claims; and claims for negligent infliction of emotional distress.

{¶ 12} Evenflo filed an answer on June 15, 2020, denying liability and asserting various affirmative defenses. The court's initial scheduling order, filed on July 20, 2020, set disclosure of experts for September and October 2020, a discovery deadline of April 23, 2021, and a 15-day trial to begin in August 2021. On November 24, 2020, the court filed an order extending the disclosure deadlines for experts; otherwise the prior order remained. The same day, the court filed separate orders for a final pretrial on July 23, 2021, and a settlement conference on July 25, 2021.

{¶ 13} In December 2020, Appellants requested leave to file an amended complaint to include an additional defendant, AmSafe, Inc. ("Amsafe"), which had allegedly designed the seat buckle. After initially denying leave, the court granted leave upon reconsideration, and the amended complaint was filed on February 25, 2021. AmSafe filed a motion to dismiss on April 21, 2021, based on expiration of the statute of

limitations.   Appellants then dismissed AmSafe without prejudice on May 18, 2021.

{¶ 14} After Appellants filed a motion to compel discovery, the court filed an agreed protective order on June 22, 2021.   The same day, the court vacated the prior scheduling order and ordered the parties to appear for a June 30, 2021 scheduling conference.   On July 1, 2021, the court set a new trial date, again for 15 days, beginning on October 24, 2022.   Appellants' deadline to identify experts was extended until December 10, 2021, and Evenflo's deadline was extended to February 11, 2022.   Each side was also given 30 days to submit rebuttal expert reports after receiving a report from the opposing side's expert.   Amended Scheduling Order (July 1, 2021), p. 1.   Discovery was to be completed by April 15, 2022, and the summary judgment deadline was June 17, 2022. *Id.*

{¶ 15} Another amended scheduling order was filed on December 22, 2021, extending expert disclosure dates until March 18, 2022, for Appellants, and until May 20, 2022, for Evenflo.   Rebuttal reports were again allowed within 30 days of receipt of the opposing expert's report or no later than June 22, 2022.   Discovery was to be completed by July 22, 2022, and the summary judgment deadline was extended to August 22, 2022. The trial date remained the same.   Second Amended Scheduling Order (Dec. 22, 2021), p. 1-2.   The expert disclosure deadlines were again extended in March 2022, based on Appellants' unopposed motion for an extension.   Thus, Appellants were to disclose experts by May 1, 2022, Evenflo was to disclose experts by July 1, 2022, and rebuttal expert reports again were to be disclosed within 30 days after receipt of the opposing expert report or no later than July 15, 2022.   The summary judgment deadline and trial

date remained the same.   *See* Third Amended Scheduling Order (Mar. 11, 2022), p. 1-2.

{¶ 16} Subsequently, on April 7, 2022, the court granted Evenflo's unopposed motion to bifurcate the compensatory and punitive damages portions of the trial.   On May 1, 2022, Evenflo filed a motion for judgment on the pleadings, contending that Counts I, III, IV, and VI contained abrogated common law claims.   Ultimately, on July 1, 2022, Appellants filed a motion for leave to file a second amended complaint, with the complaint attached.   The purpose was to withdraw Counts I, III, IV, and VI.   The court granted the motion on August 8, 2022.   As a result, the remaining claims left in the case were Counts II and V, which were relabeled as Counts I and II.

{¶ 17} Count I was a products liability claim brought under R.C. 2307.71 et seq., which alleged that the buckle was defective due to design defects and failure to warn of defects.   Plaintiffs' Second Amended Complaint, ¶s 35-49.   The specific defect alleged was that the buckle failed to release and that safer alternative designs were available when the product left Evenflo's control.   *Id.* at ¶ 38 and 44-45.   Count I further alleged that Evenflo knew or should have known of the risk, but failed to warn of it, and also negligently and improperly instituted inadequate and ineffective recalls.   *Id.* at ¶ 46-47. Finally, Count I alleged that the design defects proximately caused Appellants' physical injuries and emotional distress and caused the injuries and deaths of Shawna and Tristan. *Id.* at ¶ 48.   The remaining count, Count II, was a wrongful death claim based on the children's deaths.

{¶ 18} In the meantime, on May 2, 2022, Appellants disclosed their experts, and

on July 1, 2022, Evenflo did the same. At that time, Evenflo served Appellants with the expert report of its medical witnesses, Dr. Lisa P. Gwin and Dr. Nicole P. Bernal. *See* Defendant Evenflo Company, Inc.'s Expert Witness Disclosures (July 1, 2022), p. 1-2.

{¶ 19} On August 22, 2022, both sides filed motions for summary judgment. On September 19, 2022, Appellants responded to Evenflo's summary judgment motion. The same day, Evenflo filed a combined response to Appellants' summary judgment motion and a motion to strike declaration and documents not permitted under Civ.R. 56(C). Also on that day, Appellants filed an amended declaration in opposition to Evenflo's motion for summary judgment.

{¶ 20} On September 23, 2022, Appellants filed motions in limine seeking to exclude expert testimony and reports of Evenflo's experts, Dr. Bernal and Dr. Gwin. They also filed several other motions in limine a few days later. Likewise, Evenflo filed a number of liminal motions on September 26, 2022, including motions to exclude certain opinions of Appellants' medical experts, Dr. Gerald A. Shiener and Dr. Anjay Khandelwal. On September 30, 2022, Appellants responded to Evenflo's motion to strike and to Evenflo's memorandum in opposition to summary judgment; the same day, Evenflo filed both a response to Appellants' summary judgment motion and a motion to strike affidavits of Dr. Khandelwal. On October 11, 2022, Appellants responded to the motions to exclude opinions of Dr. Shiener and Dr. Khandelwal.

{¶ 21} Finally, on October 26, 2022, the court issued a decision overruling Appellants' summary judgment motion and denying in part and granting in part Evenflo's cross-motion for summary judgment. *See* Decision and Judgment Entry, Granting in

Part and Overruling in Part, Defendant's Cross-Motion for Summary Judgment and Overruling Plaintiffs' Cross-Motion for Summary Judgment (Oct. 26, 2022) ("Decision"). In short, the court found that there were genuine issues of material fact concerning whether the buckle used in the SureRide car seat was defective. However, the court also found that Appellants had failed to establish genuine issues of material fact concerning whether the defect in the car seat caused the children's injuries and deaths. This, in turn, eliminated Gary Mays's claim for emotional distress under R.C. 2125.02. The court did find that genuine issues of material fact remained concerning Evenflo's liability for injuries Frost sustained while trying to extricate Tristan from the car seat. *Id.* at p. 2.

{¶ 22} The following day, the court filed an order amending the Decision to include a Civ.R. 54(B) certification. The court also stayed proceedings in the case pending appeal. Appellants then timely appealed from the summary judgment decision.

## II. Summary Judgment as to Proximate Cause and the Sham Affidavit Rule

{¶ 23} We will address the first two assignments of error together because they are interrelated. Appellants' first assignment of error states that:

The Trial Court Erred in Granting Summary Judgment as to Proximate Cause of the Injuries and Deaths of Tristan and Shawna Mays.

{¶ 24} Appellants' Second Assignment of error is that:

The Trial Court Erred in Applying the "Sham Affidavit" Rule to Strike Medical Experts' Timely-Served Rebuttal Reports, Which Were Not

Prepared Solely to Defeat Summary Judgment Like in *Pettiford v. Aggarwal*, but in Accordance With Appellants' Right to File "Rebuttal Expert Reports" Pursuant to the Existing Scheduling Order.

**{¶ 25}** Under these assignments of error, Appellants contend that the trial court erred in granting summary judgment to Evenflo on the issue of the proximate cause of the children's injuries and death. Appellants have made separate arguments regarding each child. In addition, Appellants contend that the trial court erred in disregarding the rebuttal reports of their medical experts, as they were entitled under Ohio law and the court's scheduling order to submit rebuttal reports. Before responding to those points, we will outline the standards for summary judgment motions, the law that applies to proximate cause in product liability actions, and principles of the wrongful death law.

### A. Summary Judgment Standards

**{¶ 26}** Summary judgment is governed by Civ.R. 56. Under that rule, "[s]ummary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

**{¶ 27}** "[A] party seeking summary judgment, on the ground that the nonmoving

party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). "[I]f the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial." *Id.*

{¶ 28} " 'As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Turner v. Turner*, 67 Ohio St.3d 337, 340, 617 N.E.2d 1123 (1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "determining whether issues of disputed fact exist is different from making findings of facts. While it is true that trial courts are generally in the best position to determine the weight of evidence and the credibility of witnesses when acting as a trier of fact, *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), on a summary-judgment motion, any inferences regarding the evidence, including the resolution of ambiguities or inconsistencies, must be made in a manner that favors the nonmoving party, Civ.R. 56(C)." *Smathers v. Glass*, Ohio Slip Opinion No. 2022-Ohio-4595, __ N.E.3d __, ¶ 32, citing *Wills v. Frank Hoover Supply*, 26 Ohio St.3d 186, 188, 497 N.E.2d 1118 (1986).

{¶ 29} We review summary judgments de novo, "which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127,

2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.). In de novo review, we independently review trial court decisions and give them no deference. *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192, 699 N.E.2d 534 (8th Dist.1997).

## B. Products Liability Law

{¶ 30} As pertinent here, R.C. 2307.73(A) provides that manufacturers are subject to liability for product liability claims if claimants establish three requirements by a preponderance of the evidence. First, the product "was defective in design or formulation as described in section 2307.75 of the Revised Code, [or] was defective due to inadequate warning or instruction as described in section 2307.76 of the Revised Code, or was defective because it did not conform to a representation made by its manufacturer as described in section 2307.77 of the Revised Code." Second, the defect must proximately cause the claimant's harm, and third, "[t]he manufacturer designed, formulated, produced, constructed, created, assembled, or rebuilt the actual product that was the cause of harm for which the claimant seeks to recover compensatory damages." R.C. 2307.73(A)(1), (2), and (3). Under R.C. 2307.75(A), "a product is defective in design or formulation if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section."

{¶ 31} "[F]or a party to recover based upon a strict liability in tort theory, it must be

proven that: '(1) There was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendant; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss.' " *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 321, 364 N.E.2d 267 (1977), quoting *State Auto Mutual Ins. Co. v. Chrysler Corp.*, 36 Ohio St.2d 151, 304 N.E.2d 891 (1973). " 'Proximate causation' is described as ' * * * some reasonable connection between the act or omission of the defendant and the damage the plaintiff has suffered.' " *R.H. Macy & Co. v. Otis Elevator Co.*, 51 Ohio St.3d 108, 554 N.E.2d 1313, 1316 (1990), quoting Prosser & Keeton, *Law of Torts,* Section 41, 263 (5th Ed.1984).

{¶ 32} Regarding claims of failure to warn, "[u]nless the danger posed by a product is generally known and recognized by a consumer, Ohio imposes on manufacturers two related duties to warn: a duty to warn of dangers known to the manufacturer at the time of sale of the product and a duty to warn of dangers that were not obvious at the time of sale but became known to the manufacturer after the product was sold to a consumer." (Footnote omitted.) *Linert v. Foutz*, 149 Ohio St.3d 469, 2016-Ohio-8445, 75 N.E.3d 1218, ¶ 26. "To prove a failure-to-warn claim, a plaintiff must establish that a duty to warn against reasonably foreseeable risks exists, a breach of that duty occurred, and the plaintiff's injuries were proximately caused by the breach." *Id*. at ¶ 27, *citing Miller v. ALZA Corp.*, 759 F.Supp.2d 929, 934 (S.D.Ohio 2010). "The postmarket duty to warn recognizes that '[e]ven when a product is not defective at the time of sale, a manufacturer may be subject to liability if it subsequently learns of dangers attendant to the use of the product or methods to avoid serious risks and fails reasonably to communicate that

information to product users.' " *Id.* at ¶ 31, quoting Henderson & Twerski, *The Products Liability Restatement in the Courts: An Initial Assessment*, 27 Wm. Mitchell L.Rev. 7, 28 (2000).

## C.   Wrongful Death Actions

**{¶ 33}** R.C. 2125.02(A) provides that "a civil action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin of the decedent."

**{¶ 34}** " 'In order to prevail in a wrongful death cause of action, the personal representative of the decedent must prove these elements: "1) a wrongful act, neglect or default of defendant which proximately caused the death and which would have entitled the decedent to maintain an action and recover damages if death had not ensued; 2) that a decedent was survived by a spouse, children, parents, or other next of kin; and 3) that the survivors suffered damages by reasons of the wrongful death." ' "  *Jordan v. Howard*, 2d Dist. Montgomery No. 29190, 2021-Ohio-4025, ¶ 61, quoting *Bishop v. Nelson Ledges Quarry Park, Ltd.*, 11th Dist. Portage No. 2004-P-0008, 2005-Ohio-2656, ¶ 19.   (Other citation omitted.)

## D.   The Trial Court's Decision

**{¶ 35}** In the trial court, Appellants presented evidence that the crotch buckle used

in the SureRide car seat was defective in several ways, including: (1) the need to push toward the top of the buckle to unlock the buckle, without designing the push button to help ensure that was where force would be applied; (2) the need to tilt the buckle to reliably get the latch plates to release from the buckle; (3) the need to loosen the harness while pushing on the buckle in order to help unlatch it; and (4) the buckle's vulnerability to contamination. Gary Whitman Deposition, 59-60 and 62. Furthermore, Whitman stated that "[a] buckle that can fail to release readily or is very difficult to release, is not safe for any child in that seat because of potential of fire, water immersion, [or] medical emergency." *Id.* at 74. The trial court found that Appellants had established a genuine issue of material fact concerning a design defect based on the force that was required to release the buckle and where the force needed to be applied. Decision at p. 25-31. However, the court found no such genuine issues of fact concerning the issues of contamination or about whether Evenflo had failed to warn consumers of the defects. *Id.* at p. 31-33.

{¶ 36} Previously, in discussing the issue of proximate cause, the court had said that applying the proximate cause doctrine in this case was difficult, because Appellants conceded that the defective buckle did not cause the fire. *Id.* at p. 21-22. The court further stressed that Appellants had sued others, including the vehicle's manufacturer (General Motors) in Michigan (which case was dismissed), had unsuccessfully tried to join the buckle's manufacturer (AmSafe) in the current case, and had then sued AmSafe

in North Carolina (where the accident occurred).[2] This led the court to conclude that Appellants believed all three parties might be liable. *Id.* In view of these facts, the court applied an "exception" to proximate cause in Section 433B(2) of the Restatement of Torts and found that Evenflo could be held jointly and severally liable if Appellants established a colorable claim of substantial-factor liability on Evenflo's part. *Id.* at 22-24. This was based on *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), which found that "2 Restatement of the Law 2d, Torts (1965), Section 433B(2) is applicable where a single, indivisible injury is proximately caused by the successive tortious acts of multiple defendants." *Id.* at 198.

{¶ 37} Thus, "[w]here a plaintiff suffers a single injury as a result of the tortious acts of multiple defendants, the burden of proof is upon the plaintiff to demonstrate that the conduct of each defendant was a substantial factor in producing the harm." *Id.* at paragraph five of the syllabus. "Once this burden has been met, a prima facie evidentiary foundation has been established supporting joint and several judgments against the defendants. Thereafter, the burden of persuasion shifts to the defendants to demonstrate that the harm produced by their separate tortious acts is capable of apportionment." *Id.* at 198.

{¶ 38} When the trial court returned to considering proximate cause, it first addressed whether summary judgment should be granted on the wrongful death and survivorship claims involving Shawna and Tristan. *See* Decision at p. 34-57. During

---

[2] The claims in the North Carolina case, except claims asserted by Kristina for her own personal injuries, were dismissed in March 2023 based on the expiration of the statute of limitations. *See Frost v. Amsafe Commercial Prods., Inc.*, W.D. North Carolina No. 1:21-cv-156-MOC-WCM, 2023 WL 2700732, *6 (Mar. 29, 2023).

this discussion, the court discussed in detail the testimony of Appellants' medical expert Dr. Khandelwal. *Id.* at p. 38-57. Ultimately, the court disregarded the doctor's rebuttal affidavit as "sham" and found that Appellants had "elicited no expert medical opinion to support their wrongful death or survivorship claims on behalf of Tristan or Shawna's wrongful death claim." *Id.* at p. 55. While the court said Shawna's survivorship claim was a "closer question," it eventually found that Appellants had failed to establish "a proximate causal relationship between the seat buckle and" this claim. *Id.* at p. 57.

### E. Background as to the Buckle and the Fire

{¶ 39} According to Appellants, genuine issues of material fact existed concerning whether Tristan "experienced pain and suffering and ultimately died because he was trapped inside a recalled Evenflo car seat with a defective buckle that would not release during a car fire." Appellants' Brief, p. 8. In this regard, Appellants argue the trial court erred in disregarding Kristina's testimony and facts critical to the proximate cause inquiry. With respect to Shawna, Appellants contend that "[t]he amount of time that Kristina was forced to spend struggling with Tristan's buckle was precious time that she could have spent attempting to go back to free Shawna, or at the very least, tending to Shawna immediately after she exited the vehicle in flames." *Id.* at p. 13.

{¶ 40} Construing the evidence most favorably to Appellants, the buckle used on Tristan's car seat (either an AmSafe QT1 or QT3) was defective in design because it needed to be pushed at the top rather than the center or bottom of the button, and therefore was difficult to open. A second design defect existed because of the need to

tilt the button or tilt the buckle because of the angle at which the tongues went down into the buckle. In order for the tongues to come out of the buckle, they needed to pivot rearward. James Eaton Deposition, 66-67, 71, 79-81, 92, and 106-107. Both AmSafe and Evenflo were aware of these issues and complaints about opening the buckle during the design process, and the issues were never resolved before the buckle was placed into Evenflo car seats in August 2011. *Id.* at 104-105, 107-109, and 110-111; Eric Dahle Deposition, 78; Whitman Depo. at 293-294. Both Evenflo and its primary competitor, Graco, used these buckles, and they were identical other than the color. Eaton Depo. at 92 and 94-95; Johnathan Conaway Deposition, 21. The cost of the AmSafe buckle was cheaper than the buckle that was originally intended to be used on the SureRide. Conaway Depo. at 68-69, 77-79, and 81.

{¶ 41} After Evenflo placed the QT buckle into car seats, customer complaints rose by about 2,239%. Eaton Depo. at 199. About six months after the buckle was introduced, Evenflo began receiving lots of complaints about the buckle, including multiple calls a day. The most common complaint was that the button was hard to push and unlatch. Dahle Depo. at 150, 317, and 352-353. In addition, issues arose due to contamination of the buckles with substances like food and liquids, which also made the buckles difficult or impossible to unlatch. Eventually, the National Highway Traffic and Safety Administration (NHTSA) became involved due to complaints from both Evenflo and Graco customers about difficulty in unlatching the buckles. Eaton Depo. at 112.

{¶ 42} On October 15, 2012, NHTSA opened an investigation on the Graco buckle, and Evenflo became aware of it shortly thereafter, around October 19, 2012. AmSafe

also told Evenflo that the investigation involved or could potentially involve the QT1 buckle. *See* Ex. 56, EVE-007604 to EVE-007606, attached to Plaintiffs' Response; Dahle Depo at 366, 374 and 468; and Eaton Depo. at 103-104. AmSafe was developing a QT3 buckle, but it told Evenflo in October 2012 that while the QT3 might improve functionality, it would not resolve the contamination issue. *Id.* at 112-114 and 243. However, the QT3 did not resolve the issues with the QT1 design. *Id.* at 233 and 239.

{¶ 43} For testing purposes, AmSafe asked Evenflo for samples of buckles that had been returned because they were difficult to unlatch or would not unlatch. Testing in December 2012 of 13 buckles indicated that at least 25% did not meet federal release force requirements. Eaton Depo. at 286, 290-296, 300-301, and 354; Charlie Hall Deposition, 223. Evenflo was aware of these results; AmSafe provided them to Evenflo. Eaton Depo. at 307 and 313; Dahle Depo at 497 and 500.

{¶ 44} In March 2013, Evenflo also received complaints from the Virginia Department of Health (a user of the Titan, the institutional counterpart of the SureRide) that three locations had reported problems with the harness buckle sticking and not releasing such that they had been unable to get children out of the seats. Greg Greulich Deposition, 54-55. Although Evenflo became aware of the problems and stopped ordering the QT1 buckle in June 2013, it continued to use the defective buckles in its car seats until its supply of buckles was exhausted. Conaway Depo. at 171-172; Amy Blankenship Deposition, 406-407; and April 30, 2013 Dahle email, "QT Buckle Changes," EVE-008059 to EVE-008060, attached as Ex. 28 to Plaintiffs' Response.

{¶ 45} Between June 20, 2012, and March 23, 2013, Evenflo used the QT1 buckle

on the SureRide; it then used the QT3 buckle between March 17, 2013 and October 17, 2013. Conway Depo. at 69, 75, 79, 81, and 93-94; April 2, 2014 Evenflo Response to NHTSA Office of Defects Investigation ("ODI") Feb. 5, 2014 Information Request attached as Ex. 31 to Plaintiff's Response, EVE-01324. Previously, in March 2013, Evenflo had made a change from the QT1 buckle to the QT3 buckle, which, again, did not resolve the design issues. Dahle Depo. at 417.

**{¶ 46}** On February 7, 2014, Graco issued a safety recall for millions of infant toddler and booster seats produced with the QT1 and QT3 buckles as well as a "Signature" buckle, and more than six million seats were recalled between then and June 2014. *See* ODI Resume for Investigation EA 13-001, FROST-000164 to FROST-000170, attached as Ex. 18 to Plaintiff's Response.

**{¶ 47}** Evenflo kept using the QT buckle until April 2014 and did not recall car seats using the buckle until April 2, 2014. The recall was based on contamination, which "potentially could create a dangerous situation in an emergency." The recall report did not mention the other design issues. Eaton Depo. at 415-416 and 418-419; Dahle Depo. at 556-557; Affidavit of Gary Whitman attached as Ex. 20 to Plaintiffs' Response, FROST-400111.

**{¶ 48}** Kristina and her family members were not able to determine where Tristan's car seat had come from but were able to identify it as an Evenflo car seat, and analysis of the recovered components from the fire confirmed that the buckle system was an Evenflo/AmSafe QT1/QT3. Richard Frost Deposition, 18, 23-24, 27, 48, and 102; Whitman Aff. at FROST-400108.

{¶ 49} During her deposition, Kristina described the events that occurred once she was alerted by other cars to pull over. She stated that she did not see any smoke or steam before pulling over, nor did she hear anything unusual. As soon as she pulled over and put the car in park, she saw smoke coming out of the front end of the car. Kristina Depo. at 54. Kristina did not see any flames until she opened her door, but she then realized the flames were higher than her and higher than the top of the car. *Id*. at 56.

{¶ 50} Kristina ran immediately to Shawna's door, opened it, and tried to get Shawna out. She was not able to get Shawna's seat belt undone; she thought it was because she had to reach so far around Shawna. Kristina spent seconds trying to get Shawna out, but Kristina caught on fire on her legs, clothing, skin, and arms. *Id*. at 58, 60 62, and 64. Kristina immediately ran behind the vehicle and put the fire out by rolling in the grass three or four times. It was very quick, 30 seconds to a minute. *Id*. at 66. At that point, Kristina immediately ran to Tristan's side of the car. *Id*. at 67.

{¶ 51} During Kristina's deposition, the following exchange occurred:

Q. So is that the passenger side of the car?

A. It is, yes, sir. Opened the door, and when I tried to get Tristan out I sat there for a minute going like this (indicating). I remember trying to hold – and I was catching fire, but I remember squeezing that buckle like this (indicating) and jerking like this (indicating), panicking, catching on fire. And I had to run away again and rolled myself out.

Q. Okay. So did you open the door on the right rear of the

Rendezvous?

A. Yes.

Q. Prior to getting to it, were there flames coming out from under the Rendezvous on the passenger side?

A. I believe so. Like I said, I think the car was – was beginning to be engulfed now that the vehicle had stopped, but I had enough space that I could create to open the car door. My palms weren't burned, and I opened the car door and created enough space – the flames weren't inside the car. It all came from underneath the vehicle. So it gave me a little bit of space and time before those flames caught underneath me again.

* * *

Q. And how long did you say you attempted to remove Tristan?

A. I mean, as long as it takes me to do this (indicating) in front of you right now, you know.

Q. So seconds.

A. It was about seconds to get there before I would catch fire again.

Q. And it sounds like you're doing this through flames coming up from under the vehicle?

MS. REILLY: Objection; form.

THE WITNESS: Well, I did struggle with the seat belt. I don't think I should have struggled with the seat belt. It makes sense now.

Q. My question was were there flames coming up from under the

vehicle now while you were trying to do this.

    A.   Yes, sir.   Yes, sir.

Kristina Depo. at 67-68.

{¶ 52} According to Kristina, when she caught fire a second time, she rolled herself out again.  By the time she stood up, Shawna came walking up to her, all black, with no hair or skin left.  *Id.* at 73.  By the time Kristina ran again toward the vehicle, Tristan's body exploded from it and landed on the ground.  *Id.*  Kristina further stated that when she rolled herself out the first time and went to Tristan's door, there were no flames or smoke inside the vehicle that she could remember.  *Id.* at 75-76.

{¶ 53} When Kristina was asked if she blamed Evenflo for what had happened to Shawna, she said, "I do in the way that I was so distracted trying to get that seat belt that I couldn't even attend to Shawna in the seat next to him."  *Id.* at 124.  The following exchange then occurred:

    Q.   Okay.  So but if I understand correctly, you told me that attempting to get Tristan out, that was just a few seconds.

    MS. REILLY:   Objection; form.

    THE WITNESS:   Long enough to struggle.

    MR. BRICKER:

    Q.   And when you were struggling, what were you doing?  Tell me more specifically what you were doing.

    A.   I was just trying to unlatch that buckle, that first buckle that you have to unlatch, and then you take the top part apart.  And I couldn't get

that – that was the first thing I went to.

  Q. Okay. Did you actually attempt to press the buckle, ma'am?

  A. Yes, sir. Yep.

  Q. And are you saying you could not get the button to depress?

  A. Yes, Sir. I sat there pressing it, pressing it, pressing it over and over again.

Kristina Depo. at 124-125. Kristina also said that she could not recall a specific duration when she struggled with the seat, but "It was a few seconds worth of struggling." *Id*. at 72.

{¶ 54} Other than Kristina, there were a number of eyewitnesses to the events surrounding Kristina's attempt to free the children. These witnesses included Hallie Oocumma; Shawn Lyvers, and Robert Tanner Morris. Oocumma was the first person on the scene and actually saw the vehicle while Kristina was driving. Oocumma observed what appeared to be like "sparklers" under the left (driver's side) wheel, where a muffler would be. Hallie Oocumma Deposition, 11-12 and 15. As Oocumma got closer to the car, she saw flames in the same area, about the size of two matchsticks together, and started flashing her lights. *Id*. at 17. About two minutes elapsed between when Oocumma began flashing her lights and when Kristina pulled over. Oocumma drove past and pulled over about 100 feet ahead of Kristina, and two other cars then pulled over, one behind Kristina's car and one ahead of her car. *Id*. at 20-21. When Oocumma drove past Kristina's car, she saw two children in the backseat watching a movie. *Id*. at 61.

{¶ 55} As Oocumma got out of her own car, the fire was under Kristina's car on the rear driver's side, and the flames were about two feet tall. *Id.* at 24. The flames were going toward the rear passenger's tire, and at that point went into the car. When the fire began to get inside the back of the car, Oocumma saw the flames first in the trunk. *Id.* at 25. The trunk was engulfed pretty quickly. Oocumma estimated that no more than 30 seconds elapsed between when she got out of her car and when she saw the trunk area fully engulfed. *Id.* at 26. She further stated that fire went a lot more quickly from the trunk to where the rear or passenger area was fully engulfed, in no more than ten seconds. *Id.* at p. 27. Oocumma also estimated that in another 30 seconds, the fire had reached the front passenger area. *Id.* She further said that when Kristina reached into Shawna's side of the car, flames surrounded Shawna. *Id.* at 33. Later, Oocumma estimated that about five minutes had elapsed from the time she exited her own vehicle to when Kristina's car was fully engulfed, and that about three minutes had elapsed from the time she exited to when the rear passenger area was fully engulfed. *Id.* at 84-85.

{¶ 56} On the night of the incident, Robert Tanner Morris was driving in the same direction as Kristina and saw the car fire when he was about two hundred yards away. The driver's side rear door was open when he came upon the scene, and Morris observed a woman (Kristina) reaching with both arms and the upper part of her body inside the vehicle. Kristina was reaching in and out, looking panicked, as if she were trying desperately to get something out of the car. Morris Deposition, 19, 21, and 22. There were several attempts, and Morris estimated that this lasted several seconds. *Id.* at 24.

{¶ 57} When Morris pulled up, flames were coming out of the side windows and

doors. *Id.* at 17. As Kristina was reaching in on the driver's side, Morris believed flames were coming out of the rear passenger doorway on the driver's side, maybe four or five inches out. He did not recall how high the flames were. *Id.* at 23. As Morris was running up, he got a glimpse of the girl (Shawna), who seemed to be stuck on her seatbelt. *Id.* at 24-25. Morris stated that Shawna got out eventually. A newspaper article reported at the time that Morris had said the girl fell out of the car. *Id.* at 29-30. However, Morris also said during his deposition that he did not actually see Shawna get out of the car. *Id.* at 65.

{¶ 58} As Morris ran up, he saw Kristina run to the passenger's side of the car, and he ran up too. This was within a matter of seconds. *Id.* at 34. Morris did not believe that Shawna had gotten out of the car yet when Kristina got to the right passenger side. As far as Morris could recall, Shawna exited the vehicle shortly after that point. He estimated the time as being no more than six to eight seconds. *Id.* at p. 36-37. The first clear visual Morris recalled was seeing Shawna on the asphalt (the road). When he first saw Shawna after she exited from the vehicle, she appeared to be pretty severely burned. *Id.* at 37-38. Morris did say that when he made this observation of Shawna, he was still in the area of the rear passenger side of the vehicle where Kristina was attempting to remove Tristan from the car seat, and he immediately noticed others were tending to Shawna or were on their way to tend to her or give her some aid. *Id.* at 65-66.

{¶ 59} Morris could see the second child (mostly his legs and a bit of his arm) and saw that the child (Tristan) was in a car seat. Morris Depo. at 35. At that point, it just seemed like flames were in the entire vehicle, including the portion of the vehicle where

Tristan was sitting. He believed the flames were coming out from where Tristan was sitting, out the door or the window on the rear passenger side. *Id.* According to Morris, when Kristina got to the passenger side of the car, she tried to reach in in an effort to get Tristan out of the car, but at that point, the flames were too intense to really even make an effort to reach him. *Id.* at 38.

{¶ 60} Morris estimated that the flames coming out of the car at that time were perhaps a foot above the top of the vehicle, but he could not recall if Kristina's entire body was outside the flames when she was attempting to reach in. He did not believe Kristina was able to reach in as far because the flames were a little more intense then. *Id.* at 39-40.

{¶ 61} The third eyewitness, Shawn Lyvers, was traveling in the opposite direction from Kristina. Lyvers saw flames and saw a woman (Kristina) in the back seat driver's door, struggling to get something out. Shawn Lyvers's Deposition, 10-11. Lyvers turned around as soon as he could at a turnaround not far up the road and drove back to the scene, where he parked on the right side of the road behind Kristina's vehicle. He estimated this was no more than a minute later. As Lyvers pulled up to park, he saw a little girl (Shawna) walking behind the vehicle, and her hair was on fire. *Id.* at 13. At that time, the mother (Kristina) was on the passenger side of the vehicle, struggling to get the other child out. *Id.* at 14.

{¶ 62} Lyvers stated that Kristina was struggling real hard to get into the car. The door was open and the flames were pretty high. Lyvers believed Kristina got inside. She was in the doorway, fighting, and she was severely burned. *Id.* at 14-15.

{¶ 63} When Lyvers first pulled up, he asked a woman if everyone had gotten out, and she said no. Lyvers then ran to get a sheet out of his truck and ran toward the vehicle. He made it to the doorway of Kristina's vehicle but stepped back because the tires began to explode. At that point, Lyvers saw Shawna wandering around again, grabbed her, and ran halfway back to his truck, which was about 100 feet away. *Id.* at 13 and 16. At that time, Kristina was on the side of the road. *Id.* at 21.

{¶ 64} According to Lyvers, Kristina could not get into the car because the flames were too high. She was definitely not in past her arms, but from his vantage point, he could not see how far she was making it in. Kristina would stick her arms in and then quickly have to pull them back due to the heat. Lyvers Depo. at 25. Lyvers further said that when he approached the passenger side of the car, the flames were from the floor all the way up to the top. The flames were in the car and it was completely engulfed. At that point, the flames were mostly vertical. He did not think the flames were extending outward; the flames were more upward. *Id.* at 24 and 49-50.

{¶ 65} While various fire departments and police responded to the scene, they did not arrive in time to witness Kristina's attempts to rescue the children. The emergency medical personnel who attended to Shawna indicated that she was breathing on her own, did not have trouble breathing, was alert and oriented and was talking to a paramedic the whole time. Taylor Depo., 50, 55-56, and 67; Soop Depo., 72-73. Neurologically, Shawna was intact. *Id.* at 73. Pain medication was administered at the scene because the pain was becoming overwhelming. On leaving the scene, Shawna was transported to a helicopter and was still conscious when she was transferred. *Id.* at 84-85.

F.   Shawna

**{¶ 66}** Under R.C. 2305.21, a survivorship action may be brought on behalf of a person for injuries, "notwithstanding the death of the person entitled or liable thereto."   "A decedent may not recover for pain and suffering when it is shown that the decedent was rendered unconscious at the instant of the injury and died of such injuries without ever having regained consciousness."   *Laverick v. Children's Hosp. Med. Ctr. of Akron, Inc.*, 43 Ohio App.3d 201, 202, 540 N.E.2d 305 (9th Dist.1988), citing *Lorain Times-Herald Co. v. Del Boccio*, 15 Ohio Law Abs. 735 (9th Dist.1933).   "However, one may recover for the pain and suffering endured when there is affirmative evidence to show that the decedent was not completely unconscious during the interval between the injury and death."   *Id.*, citing *Flory v. New York Cent. RR. Co.*, 170 Ohio St. 185, 189, 163 N.E.2d 902 (1959).   *Accord Monnin v. Fifth Third Bank of Miami Valley, N.A.*, 103 Ohio App.3d 213, 227, 658 N.E.2d 1140 (2d Dist.1995).   Clearly, Shawna survived the accident and had conscious pain and suffering at least up until the time she was transported by helicopter.

**{¶ 67}** Regarding Shawna's survivorship claim, the trial court phrased the issue as "whether a genuine question exists whether Shawna was out of the vehicle within six to ten seconds after Kristina began pressing the buckle to release Tristan and, if so, could Kristina have eased Shawna's suffering."   Decision at p. 55.   This was based on Dr. Khandelwal's response to a hypothetical question in his deposition, wherein he stated that "the buckle was not the proximate cause of Shawna's injuries if she was out of the

vehicle within seven-or-eight seconds after Kristina reached the rear passenger door." *Id.*

{¶ 68} The court found no triable issue on the survivorship claim, based on the testimony of Morris and others who saw Shawna outside the vehicle. *Id.* at 56. The court stressed that "[s]ince Mr. Morris also saw Shawna fall from the car before he joined Kristina at the rear passenger door, (*see id.* at 32, 33), Shawna would have been free of the SUV within, if not before six to ten seconds of Kristina reaching the door." *Id.* The court found no evidence to refute the fact that Shawna was out of the car within this time period. *Id.*

{¶ 69} The court incorrectly stated that Morris saw Shawna fall out of the car, as he clearly said he did not actually see Shawna exit. Nonetheless, Morris did say that he saw Shawna within six to eight seconds of when Kristina arrived at Tristan's door. Furthermore, Lyvers also saw Shawna outside the vehicle at the time that Kristina was moving to Tristan's side of the car. Lyvers Depo. at 13 and 27. At that point, Shawna's injuries were established, and others began attending to her. Therefore, as Dr. Khandelwal admitted, the buckle defect did not proximately cause Shawna's injuries. For the same reason, the buckle defect did not cause the injuries Shawna sustained before she exited the car, and there was no basis for a wrongful death claim on her behalf.

{¶ 70} As noted, to prevail in a wrongful death action, a defendant's wrongful act or neglect must have proximately caused the decedent's death. *Jordan*, 2d Dist. Montgomery No. 29190, 2021-Ohio-4025, at ¶ 61. And again, proximate cause requires " 'some reasonable connection between the act or omission of the defendant and the

damage the plaintiff has suffered.' " *Otis Elevator Co.*, 51 Ohio St. 108, 554 N.E.2d at 1316. Here, there was no such connection.

{¶ 71} Kristina's expert, Gary Whitman, testified as to extraction studies that were done using an Evenflo car seat with the same restraint system, but a different (non-defective) buckle, and a 22-pound surrogate dummy. *See* Whitman Depo. at 181-185. Under this scenario, a child would have been able to be removed from the seat within 10 seconds of the car door being touched and within 6-9 seconds of the attempt to unbuckle the restraint. *Id.* at 187-189. While the point of this extraction study was to show that Kristina would have had time to extract Tristan if the buckle had operated properly, the fact is that even in this situation, Shawna would already have been out of the car.

{¶ 72} In arguing that the trial court erred, Appellants focus on Kristina's testimony, stating that "Kristina also testified that Shawna was not out of the vehicle and walking toward her until after she abandoned her attempts to rescue Tristan." Appellants' Brief at p. 14, citing Kristina's deposition at 65:24-66 and 73:11-18. However, that is a misconstruction of what Kristina said. At page 65:24 to page 66 of Kristina's deposition, the following exchange occurred (after Kristina had discussed rolling herself out in the grass after trying to extricate Shawna):

Okay. And at this point in time up to this point, has anyone else come up to the vehicle?

A. I didn't see anybody until after I attempted to get Tristan out and rolled myself out again. And when I stood up and Shawna came walking up to me, I panicked. I just – and this woman had come running across the

road and got Shawna in the grass. By the time we seen [sic] Tristan gone, there were several men around me, but I don't know where they came spectating from, other vehicles, but it took them a minute to get – it was like to me as if the event had already ended by the time more people came.

{¶ 73} During this discussion, Kristina did not say that Shawna was not out of the vehicle until after Kristina abandoned her efforts to extricate Tristan. Instead, Kristina was simply describing when she first saw Shawna. That is not the same as when Shawna exited the car. Likewise, at the other cited page of Kristina's deposition, the following exchange occurred:

Q. Now, if I understand, when you caught – you yourself caught on fire a second time; is that correct?

A. Yes, sir.

Q. What did you do at that point then?

A. I rolled myself out. By the time I stood up, my daughter came walking toward me all black. No hair left, no skin.

Kristina Depo at 73, lines 11-18.

{¶ 74} Notably, Dr. Khandelwal, Appellants' medical expert, also said that if Shawna got out within seven to eight seconds or was extricated before Kristina attempted to extricate Tristan, Shawna's burn injuries were not caused by allegations about the buckle or the attempt to extricate Tristan. Dr. Khandelwal Depo. at 84 and 104. While the questions were posed as hypotheticals, there was simply no evidence otherwise, i.e., to indicate that delay in removing Tristan prevented Kristina from helping Shawna get out

of the vehicle or from assisting Shawna when she got out. This is not in any way meant to discount Kristina's efforts to save her children, which were very brave. There simply was no basis for finding any causation concerning the buckle defect. Accordingly, the trial court correctly found no genuine issues of material fact concerning whether the defect in the buckle proximately caused Shawna's injuries or death.

### G. Claims Involving Tristan

{¶ 75} Turning to the wrongful death and survivorship claims regarding Tristan, Appellants first claim that the trial court improperly disregarded Kristina's testimony about pressing the button to the buckle for "a minute" as physically impossible. Appellants' Brief at p. 8, citing Decision at p. 35, fn. 10. As noted, Kristina's testimony indicated both that she attempted to free Tristan for a minute and that she tried for "about seconds" before she caught fire again. The trial court concluded that it would have been impossible for Kristina to have spent an entire minute in the flames and heat due to the testimony of Kristina's own expert, Peter Sullivan, that the flames would have had a temperature of 1,800 degrees and that the ambient heat would have been 450 to 900 degrees. *Id.*

{¶ 76} The authority the trial court cited was *McDonald v. Ford Motor Co.*, 42 Ohio St.2d 8, 326 N.E.2d 252 (1975), which discussed the "physical fact rule." In this situation, " 'the testimony of a witness which is opposed to the laws of nature, or which is clearly in conflict with principles established by the laws of science, is of no probative value and a jury is not permitted to rest its verdict thereon.' " *Id.* at 12, quoting *Connor v. Jones*, 115

Ind.App. 660, 670, 59 N.E.2d 577 (1945). "The palpable untruthfulness of plaintiff's testimony requiring a trial court to take a case from the jury under the physical facts rule 'must be (1) inherent in the rejected testimony, so that it contradicts itself or (2) irreconcilable with facts of which, under recognized rules, the court takes judicial knowledge or (3) is obviously inconsistent with, contradicted by, undisputed physical facts.' " *Id.* at 12-13, quoting *Duling v. Burnett*, 22 Tenn.App. 522, 124 S.W.2d 294 (1938). "Each of these formulations strikes a balance between, on the one hand, the common sense notion that physical facts and evidence can be so conclusive and demonstrative that no reasonable person could accept the truth of contrary testimony, and, on the other hand, the need for courts to be wary of treating a party's theory of a case as 'fact,' when a different theory is also possible in the case." *Id.* at 13.

**{¶ 77}** As pertinent here, Sullivan concluded that the fire was caused by puddled fuel due to a breach of the fuel tank shortly after Kristina pulled over. The breach at that time would have been significant. Sullivan Deposition, 9, 16-17, 116-117, and 130. According to Sullivan, for the plume of fire to be over Kristina's head when she stepped out of the car, fuel would have to have been puddled at that point. He estimated that somewhere between a minute and a half to three minutes would elapse before the fire began to significantly consume combustible material within the passenger compartment. *Id.* at 17. Sullivan did not have an opinion about what temperatures a person seated in the second row would experience if the front driver's seat door and the second row driver's passenger door were open, nor did he have an opinion of how long it would take for combustible materials in the interior to be substantially consumed in this situation. *Id.* at

86-87.

{¶ 78} However, Sullivan did say that the flames would have been about 1,800 degrees. Flames also generate radiant heat, and if a person is within a foot of flames, the radiant heat will be 450 to 900 degrees. *Id.* at 138-139. Again, this is why the trial court concluded that Kristina could not have spent a minute attempting to unbuckle Tristan's seat. Notably, however, the court's discussion of this point was related to its conclusion that "the seconds Kristina attempted to undue [sic] the car seat buckle before she caught fire do not establish the car seat buckle proximately caused the severity of Shawna's injuries." Decision at p. 35-36. This conclusion is irrelevant, however. As noted, regardless of how long Kristina struggled with the buckle, Shawna was already out of the car before that occurred, i.e., Lyvers saw Shawna outside the car while Kristina was moving or running towards Tristan's side of the car.

{¶ 79} Nonetheless, regarding Tristan, the trial court also found that "Kristina was on fire for the second time within a matter of seconds, prior to the amount of time Whitman states the buckle should have released. (Whitman Depo. at 189 (extrication should take 6-9 seconds))." *Id.* at p. 36. Whitman's experiment showed it would take six to nine seconds to unbuckle and extricate a child or a total of 10 seconds if opening the car door were included. Kristina testified that flames were coming up from under the vehicle while she was trying to unbuckle Tristan. Kristina Depo. at 68. Therefore, Kristina's legs, at a minimum, would have been exposed to flames and radiant heat.

{¶ 80} Dr. Gwin, a medical doctor who also had an engineering degree, was retained by Evenflo and testified about the effects of radiant heat and flame. Dr. Gwin

Deposition, 6-9. Dr. Gwin classified herself as a biomechanical expert who looks at the way forces act on people and can cause injury. *Id.* at 11 and 14. Dr. Gwin could not distinguish between the burns Kristina suffered while trying to extricate Shawna as opposed to those she incurred while trying to save Tristan, other than to say the burns would go deeper in the latter situation because Kristina was being exposed to more heat. *Id.* at 76, 80-81, and 86-88. However, in speaking about the burns that would have been sustained at the temperatures in question (1,800 degrees for flames and at least 500 degrees of radiant heat), Dr. Gwin said that partial thickness burns occur within a second. Consequently, based on Kristina's injuries, Dr. Gwin stated that Kristina was likely burned for only a few seconds while trying to extract Shawna. Dr. Gwin also concluded that this time period would consist of between one and four seconds, but not likely five seconds. *Id.* at p. 66-67.

{¶ 81} Dr. Gwin did not offer an opinion about how long Kristina stood in the fire when attempting to rescue Tristan (although based on the applicable temperatures and the fact that flames were admittedly coming from under the car and burning her legs, the obvious conclusion is that Kristina would have been able to withstand this heat for only a few seconds – at most four, not six to 10 seconds or more). Dr. Gwin focused instead on the fact that the heat was too intense for Kristina to reach the buckle and that Tristan was likely unconscious due to hypoxia by the time Kristina reached him. *Id.* at 92, 95, 111-112, 114-115, 208-209, 212, and 223.

{¶ 82} Dr. Bernal, a burn specialist retained by Evenflo, also concluded that Tristan had sustained a combination of carbon monoxide and an anoxic brain injury by the time

Kristina tried to extricate him.   Dr. Bernal Deposition, 6, 11, and 75.   This was based on Kristina's testimony that Tristan " 'was staring blankly and was not responding' " and on the combustion of fire and smoke.   *Id.*, quoting from page 6 of Dr. Bernal's report, which was attached as Ex. 2 to the deposition.   No expert opined as to any level of chemicals in the car or any substance like smoke.   Dr. Gwin Depo. at 231.

{¶ 83} During Kristina's deposition, the following exchange took place:

Q.   When you were attempting to remove Tristan, did he react to you in any way?

A.   He didn't.   I asked about that because he was very blank.   He wasn't reacting to me panicking.   He didn't look over to his sister.   He was very blank.

And when I asked the fire department and other men about it they said his lungs may have collapsed by that time, but * * * that's kind of hearsay.

Kristina Depo. at 70

{¶ 84} The following further exchange occurred:

Q.   So he didn't blink?

Ms. Reilly; Objection, form.

A.   I don't remember.   He was very still.   He was very blank.

Q.   Okay.   Did he seem in distress at that point?

A.   No.   Yeah, it was very strange.

Kristina Depo. at 70-71.

{¶ 85} Morris, the only other person who was close enough to see Tristan, stated that he could see most of Tristan's legs and a bit of his arm. Morris did not see Tristan moving, nor was Tristan making any noises that he could hear. Morris Depo. at 34-35.

{¶ 86} The trial court concluded that Appellants had failed to meet the burden of establishing that the buckle defect proximately caused Tristan pain and suffering and that he was alive and conscious when Kristina tried to unbuckle the seat. Decision at p. 53. The court rejected Dr. Khandelwal's rebuttal opinions on these issues for several reasons: (1) proof of these matters was for Appellants' "case-in-chief," not rebuttal; (2) the opinions conflicted with his original deposition testimony and were improper rebuttal opinions; and (3) the opinions were improper under *Pettiford v. Aggarwal*, 126 Ohio St.3d 413, 2010-Ohio-3237, 934 N.E.2d 913, because the doctor did not address the contradictions. Decision at p. 53-54. The court further found that Dr. Khandelwal's opinions on proximate cause for wrongful death failed because he could not render an opinion that the children would have survived their injuries. *Id.* at p. 54. Likewise, genuine issues as to Tristan's survivorship claim were not established because Dr. Khandelwal could not say during his deposition that Tristan consciously suffered pain. *Id.* at p. 55.

{¶ 87} The facts pertinent to Dr. Khandelwal, again construed most favorably to Appellants, were as follows. Dr. Khandelwal was board-certified in general surgery and critical care, had spent more than 75% of his 14-year practice dealing with burns and complex wounds, and was the Chief of the Division of Burns and the Director of the Burns Institute at Akron Children's Hospital. *See* Ex. 41 attached to Plaintiffs' Response (Aug. 19, 2022 Affidavit of Dr. Khandelwal) and attached Expert Report, FROST-400345 to

FROST-400348 ("Original Expert Report").

{¶ 88} Dr. Khandelwal was deposed by Evenflo on July 12, 2022, ten days before the discovery deadline expired and two days before the deadline for rebuttal expert reports. At that time, Dr. Khandelwal had received the expert reports of Evenflo's medical experts, Dr. Bernal and Dr. Gwin, which had been sent to him on July 1, 2022. Dr. Khandelwal Depo. at 6. He had also received deposition transcripts for Appellants' experts, Gary Whitman and Peter Sullivan. *Id.* Additionally, Dr. Khandelwal had reviewed Kristina's deposition, some police reports, snippets of Lyvers' deposition, some statements Oocumma made, photos of Kristina's burns after surgery, and the death certificate and EMS reports for Shawna. *Id.* at 17, 26, 65, and 66.

{¶ 89} Dr. Khandelwal's expert report was dated May 2, 2022. *Id.* at 9. In the report, the doctor expressed the following opinions regarding Tristan:

> In all likelihood and to a reasonable degree of medical certainty, Tristan sustained significant physical and psychological trauma from the burn injuries. During the time period that he was on fire this would have caused significant pain and suffering, from both the thermal injuries as well as a sense of an inability to breathe, or asphyxiation, secondary to smoke and thermal injuries involving his face and airway.
>
> Had Kristina been able to undo the car seat in a timely fashion this would have led to a much less severe injury and to a reasonable degree of medical certainly a potentially survivable injury.

Original Expert Report at FROST-000347.

{¶ 90} During his deposition, the doctor expressed different opinions. For example, this exchange occurred:

Q. * * * Sir, do you have an opinion one way or another whether at the point Kristina Frost first attempted to reach through the flames to remove Tristan, whether the injuries Tristan had sustained at that point in time were survivable or not?

MR. MCMULLEN: Objection to form.

THE WITNESS: I don't know what – I don't think we know exactly what injuries he had sustained up to that point so I don't think we can answer that question.

Dr. Khandelwal Depo. at 85-86.

{¶ 91} After Kristina's description of Tristan when she reached him (as blank, not reacting, still, and not in distress) was discussed, the following exchange occurred:

Q. Okay. So at the point in time Kristina first gets to Tristan and attempts to remove him, do you have any opinion either way whether he is conscious?

A. I don't have an opinion – I don't have enough information to determine whether or not he was – to say whether he was or was not conscious at that point in time. There's not enough information to make that determination. I guess it also depends on what your level – of what your definition is of conscious.

Q. Well, he's staring blankly, correct, he's apparently not reacting,

as Kristina said, to anything, correct?

A. Correct. I don't recall if she said his eyes were open. I think she said he was – or not. But yeah, I mean, it – you know, once again, I mean there's just not enough information I would say to determine whether or not he was or was not unconscious.

Q. Okay.

A. My definition of conscious would be an awareness.

Q. And at that point in time do you have an opinion of whether or not he could experience physical pain when she first approached him and described him as blank and not reacting.

A. I would imagine if he has – if he has circulation going around, his, you know, brain could sense pain.

Q. * * * When I say I'm not asking you to imagine, I'm asking do you have an opinion within a reasonable degree of medical certainty whether at that point in time when Kristina described him as not in distress, blank, and not reacting, whether he was experiencing conscious pain and suffering?

MR. MCMULLEN: Objection. Asked and answered.

The WITNESS: I think it's – I think that's just very difficult. Once again, there's not enough information to say whether or not he's you know, conscious or not – at that very moment in time. I would also say that having a blank stare and not reacting does not necessarily mean that no one is experiencing pain. You can experience pain and not move. So I think

that's a difficult question to answer.

  BY MR. BRICKER:

  Q. And I'm just asking at this point, though, you don't have an opinion either way whether he was or was not –

  A. At that very exact moment –

  * * *

  THE WITNESS: -- in time I think it's very difficult for me to say one way or another.

Dr. Khandelwal Depo. at 73-75.

{¶ 92} Dr. Khandelwal also discussed the fact that lack of oxygen and/or carbon monoxide can lead to an anoxic brain injury, that children's respirations are faster than those of adults, and that a two-year old has a smaller lung capacity than adults. He further noted that hypoxemia (low blood oxygen) can cause a child's heart to stop and this is usually related to a respiratory event. *Id*. at 75-76. After this discussion, the following exchange took place:

  Q. * * * Do you have an opinion one way or another whether at the time Kristina Frost first attempted to remove Tristan he had already suffered an anoxic brain injury?

  * * *

  THE WITNESS: I don't believe – I don't have an opinion one way or another because I don't think you can answer that question.

  * * *

Q. * * * Yes, eyes open, staring blankly, not reacting, and exhibiting no distress, could that be a symptom of an anoxic brain injury?

A. I mean, I think we would have to further define distress; but a child or I guess any human being not moving and not reacting to stimuli could be a sign of – could be a sign of an anoxic brain injury.

Q. Could it be a sign of cardiac arrest?

A. It could be, yes.

*Id.* at 77-78.

{¶ 93} Later on in the deposition, Dr. Khandelwal was asked whether he disagreed with any opinions in Dr. Bernal's and Dr. Gwin's expert reports. Appellants' counsel objected at that point because it was in advance of the deadline for responding to expert reports (which was two days later, on July 15, 2022) and also noted that this was not what Dr. Khandelwal had been asked to do. Dr. Khandelwal Depo. at 94-95. Dr. Khandelwal then expressed his disagreements with several of those opinions. As relevant here, he disagreed with Dr. Bernal's opinion that Tristan's injuries would have been worse than Shawna's at the time Kristina attempted to reach him, because he had been in the car longer than Shawna. Dr. Khandelwal stressed that again, there was not enough information to tell when Tristan's burn injuries occurred. *Id.* at p. 98. This exchange then followed:

Q. So you're just saying you don't – you yourself don't have enough information either way to say whether those injuries were survivable at that point?

A. Correct. I – yeah.

*Id.*

{¶ 94} Another area of disagreement with Dr. Bernal was whether Tristan had a combination of carbon monoxide poisoning and an anoxic brain injury. In that regard, this exchange occurred:

Q. So in regards to Dr. Bernal's statements about carbon monoxide poisoning and an anoxic brain injury, your opinion is that you don't have enough information either way to say whether that had occurred, correct?

A. I don't think it's a question of me not having enough information. I don't think there is enough information.

Q. Okay. But you yourself don't have any opinion either way on that issue.

MR. MCMULLEN: Object. Form and asked and answered.

A. THE WITNESS: I don't have an opinion * * * one way or the other.

Q. Okay. Thank you And in regard to whether Tristan was experiencing conscious pain and suffering at the point in time Kristina first approached him, likewise you're just saying you don't have an opinion one way or another and you don't think there's enough information?

A. There's not enough information. * * *

* * *

Q. And you don't have an opinion one way or another, correct?

* * *

THE WITNESS:   Correct.

Dr. Khandelwal Depo. at 100-101.

{¶ 95} Based on this testimony, there was a failure to establish proximate cause between the alleged defect and Tristan's injuries, because the doctor could not say that Tristan's injuries were survivable before Kristina even attempted to release the buckle and could not say if Tristan had pain and suffering at that point.

{¶ 96} As noted, the deadline for submitting rebuttal reports was July 15, 2022. On that date, Dr. Khandelwal provided a rebuttal report.   *See* Ex. 42 attached to Plaintiffs' Response (August 19, 2022 Affidavit of Dr. Khandelwal and attached July 15, 2022 Confidential Report, FROST-409740 to FROST-409747) ("Rebuttal Report").   The doctor indicated that he had reviewed these additional materials: Wake Forest Baptist Medical Center medical records for Shawna Mays and the depositions of Hallie Oocumma, Anthony Soop, Cameron Taylor, Robert Morris, Rocky Dietz, Shawn Lyvers, and Trevor Sawyer.   *Id.* at FROST-409740.   The listed people were eyewitnesses to the fire as well as police officers and EMS personnel.

{¶ 97} The summary of the doctor's rebuttal opinions as relevant to Tristan were that:

- The evidence is consistent with the fact that Tristan burned to death.  To a reasonable degree of medical certainty, Tristan's cause of death was "thermal injuries," and his extensive burns across his entire body which [sic] are consistent with an explosion.  *See* Deposition of Kristina

Frost 74:4-6 ("Tristan's body exploded from the vehicle and landed on the ground.").

- It is more likely than not that Tristan was in a state of shock, when Ms. Frost encountered him in her attempts to free him. Ms. Frost stated that he was staring blankly, with his eyes open. There is absolutely no evidence that Tristan had carbon monoxide poisoning or that he had an anoxic brain injury at the time that Ms. Frost attempted to rescue him. The diagnosis of an anoxic brain injury must be correlated with radiological imaging and/or a detailed neurological exam, neither of which were performed on Tristan. The diagnosis cannot be medically determined with a simple visualization of the patient. There is no evidence to support that there were flames or smoke trapped in the vehicle during the rescue attempts, and therefore no evidence that carbon monoxide was even in the vehicle, let alone at what level. Without evidence of exposure to carbon monoxide and the level of that exposure, it is impossible to reach the conclusion that Tristan suffered from carbon monoxide poisoning and suffered an anoxic brain injury. Further, the doors were open, negating that this was an open space, and this would have allowed smoke to escape and subsequently not permitting the formulation and/or accumulation of carbon monoxide. It is pure speculation, and inconsistent with the available evidence, to conclude that Tristan was unconscious or deceased before or during rescue attempts. As stated above, his cause of death was

thermal injury, which is collaborated [sic] with the Medical Examiner's report.

* * *

- Despite the "freeze reaction" and being in a state of shock, based on my experience and expertise, Tristan would have experienced considerable conscious pain and suffering before succumbing to his injuries from the explosion which ultimately caused his death. The pictures indicate that Tristan's body was incinerated and contracted, and coupled with the fact that he had no burns at the time of the attempted rescue, indicate that those injuries more likely than not occurred at the time of the explosion and as per the medical examiner's report, death would have occurred within minutes.

Rebuttal Report at FROST-409740 to FROST-409741.

{¶ 98} In the rebuttal report, Dr. Khandelwal disagreed with Dr. Bernal that Tristan's burns were not survivable and that Tristan likely had a combination of carbon monoxide poisoning and anoxic brain injury when Kristina was trying to extricate him. *Id.* at FROST-409741 to FROST-409743. As to the first point, the doctor relied on Kristina's testimony that there were no flames in the car when she went to Tristan's side of the car. *Id.* at FROST-409742. As to the second point, the doctor relied on the death certificate, which stated that the interval between the onset of thermal injuries and death was "minutes." According to the doctor, this indicated the primary cause of death was "extreme temperatures, i.e., fire." *Id.* Dr. Khandelwal also relied on Kristina's

"unrebutted testimony" that "Tristan showed no visible signs of having sustained any burn injuries when she attempted to release him from the car seat." [3]   Finally, the doctor relied on these facts: Shawna was subject to the same conditions as Tristan, was able to talk and communicate after exiting, and had normal carbon monoxide, and neither Shawna nor Kristina had evidence of inhalation injury.   *Id.* at FROST-409742 to FROST-409743.  Dr. Khandelwal did not offer any explanation for the change in his opinions.

{¶ 99} Dr. Shiener, a psychologist, was named as an expert regarding Kristina's psychological prognosis, and Evenflo took his deposition on July 5, 2022.   Again, this was shortly before the deadlines for discovery and for disclosure of rebuttal reports.   Dr. Shiener did not express any opinions about Tristan during his deposition.   However, on July 14, 2022, Dr. Shiener provided a rebuttal opinion after reading the expert reports of Dr. Bernal and Dr. Gwin.   Dr. Shiener stated that:

> It is my opinion, based on my experience and expertise, that Tristan's blank stare, non-responsiveness, and stillness are, more likely than not, demonstrative of the fact that Tristan was in a defensive, behavioral "freeze" mode.   Freezing in humans is a transient state that occurs at the beginning of a threat experience that involves heightened attention, enhanced vigilance to threat cues, and a tense body location and fixated eye position.

---

[3] This statement is factually incorrect.   Kristina was never asked if Tristan had any visible signs of burns.   Perhaps Dr. Khandelwal inferred from Kristina's testimony that Tristan had no burns because she said there were no flames inside the car, but she was never asked if he had any burns.   Furthermore, when Kristina was asked during her deposition if flames had come in the vehicle when she opened the passenger door, she said, "They must have.   I mean, I caught fire so quickly that I had to go roll myself out."   Kristina Depo. at p. 62.   Thus, flames were inside the vehicle before Kristina tried to remove Tristan, at least according to some of her testimony.

Kasia Kozlowska, et. al, "Fear and the Defense Cascade: Clinical Implications and Management," (Har Rev Psychiatry July 2015). The example provided by Kozlowska et al is similar to the behavior exhibited by Tristan in this case.

Ex. 47 attached to Plaintiffs' Response (August 18, 2022 Affidavit of Gerald Shiener, MD), and July 14, 2022 Shiener Rebuttal Report, FROST-409738.

**{¶ 100}** Dr. Shiener then briefly mentioned the Kozlowska example, which involved a 10-year old girl who "froze" and remained in place when a kerosene can caught fire. The girl, therefore, failed to respond to a request from her mother to open the door. (The mother had seized the burning can and was attempting to leave.) Dr. Shiener then said:

> Based upon all the available evidence, and my expertise and experience, to a reasonable degree of medical probability, Tristan was experiencing a parasympathetic freeze response to the trauma and was shocked from seeing flames outside the vehicle, having witnessed the mother unsuccessfully attempt to remove his sister from the vehicle, witnessing his mother catch fire herself and roll herself out, subsequently witnessing Shawna extricate herself and her getting burned as she exited the vehicle. All of these events caused Tristan to suffer from an acute stress response, activating his autonomic nervous system. A child in a state of shock or exhibiting a freeze response, like Tristan, is still conscious and able to experience pain and suffering.

*Id.* at FROST-407939.

{¶ 101} The court rejected Dr. Shiener's rebuttal report for the same reasons that it rejected Dr. Khandelwal's report. *See* Decision at p. 60, fn. 17.


H.    Sham Affidavit Rule

{¶ 102} The issues of proximate cause and the sham affidavit rule are intertwined. In responding to Evenflo's motion for summary judgment, Appellants were required to show that genuine issues of material fact existed concerning the elements they had the burden to prove.   One of these was that the defect in the buckle proximately caused Tristan's injuries and death.   During his deposition, Dr. Khandelwal was unable to say whether Tristan's injuries were survivable when Kristina first reached him.   He also could not say whether or not Tristian had a combination of carbon monoxide or anoxic brain injury, and he could not express an opinion on whether Tristan suffered conscious pain and suffering.   These failures were fatal to any showing of proximate cause.   Similarly, Dr. Shiener did not even express any opinions about Tristan, as he was retained to offer opinions about Kristina's psychological injuries.   The only way Dr. Khandelwal's inability to express opinions or to find proximate cause could even have potentially been salvaged would have been if the trial court accepted the rebuttal opinions that he and Dr. Shiener prepared.   As indicated, the court rejected these opinions as sham.

{¶ 103} In arguing that the trial court erred, Appellants contend that they had an absolute right to submit rebuttal reports under the court's scheduling order as well as Ohio law, in order to rebut the opinions of Evenflo's experts.   Appellants claim that the opinions of Evenflo's experts, particularly as to the anoxic brain injury, were surprising (and

unfounded). Appellants' Brief at p. 16. In particular, Appellants rely on *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (1994), in which the court held that "[a] party has an unconditional right to present rebuttal testimony on matters which are first addressed in an opponent's case-in-chief and should not be brought in the rebutting party's case-in-chief." *Phung* at 410.

{¶ 104} In *Phung,* the plaintiff had initially sued his employer for wrongful discharge and intentional infliction of emotional distress, but after further litigation, only the emotional distress claim remained for trial. *Id.* at 408-409. The plaintiff's burden in his case-in-chief was to prove the elements of emotional distress, which included that his employer's conduct caused or exacerbated his mental distress. *Id.* at 410. During the employer's case-in-chief, a doctor testified as to an alternate cause for the plaintiff's delusional condition, which pre-existed his employment. The doctor's opinion was based on factual statements the plaintiff had made to the doctor, like the fact that the plaintiff had seen dead bodies in Vietnam, had threatened and abused his first wife, and had disputed parentage of his first son. *Id.* at 409-410.

{¶ 105} The plaintiff wanted to present rebuttal testimony from the plaintiff's sister and first wife, who had not been named as witnesses. However, the trial court refused and only allowed the plaintiff himself to testify on rebuttal. *Id.* The Supreme Court of Ohio found that while the plaintiff had challenged the truth of the facts the doctor relied on, this testimony had minimal value since "[o]ne of the few things that the parties agreed to at trial was that Dr. Phung was delusional, living in his own state of reality." *Id.* at 410. Thus, the court found the plaintiff "should have been entitled to present non-delusional,

rebuttal witnesses to contest the truth of the facts on which Dr. Benedek relied. The testimony of the two rebuttal witnesses was crucial, not cumulative, and should have been admitted by the trial court."  *Id.*

**{¶ 106}** The court further held that the rebuttal witnesses should not have been excluded even though they were not on the plaintiff's witness list.   This is the context in which the court made the statement that parties have an absolute right to present rebuttal testimony on matters first raised in the opposing party's case and that should not be brought in the party's own case-in-chief.   In this vein, the court noted that "[t]he testimony of Betsy Phung and Faye Phung, however, was not introduced to reinforce Dr. Phung's contention that WMI caused his delusional condition; instead, this testimony was offered to rebut WMI's contention that Phung's condition was caused by something other than his employment with WMI.   Thus, the testimony of these witnesses was properly offered in rebuttal and not in Dr. Phung's case-in-chief."  *Id.* at 411.

**{¶ 107}** Our court reached a similar conclusion in *Kennedy v. Merck & Co.*, 2d Dist. Montgomery No. 19591, 2003-Ohio-3774.   There, the plaintiff submitted a rebuttal affidavit from an unlisted expert in an attempt to avoid summary judgment on a design defect.   The trial court struck most paragraphs of the expert's affidavit because they related to matters that should have been brought in the plaintiff's case-in-chief, rather than as rebuttal.   The remaining paragraph was struck because it was a legal conclusion. *Id.* at ¶ 40.   We agreed, noting that the affidavit related to matters that the plaintiff would have to establish at trial in order to avoid a directed verdict.   *Id.* at ¶ 40.   As applicable here, the "rebuttal opinions" were offered to address deficiencies in Dr. Khandelwal's

testimony and related to matters that Appellants would have to prove, i.e., proximate cause, to avoid a directed verdict at trial.

{¶ 108} While the issue here is summary judgment, directed verdict motions involve the same inquiry. *See* Civ.R. 50(A)(4); *Santho v. Boy Scouts of Am.*, 168 Ohio App.3d 27, 2006-Ohio-3656, 857 N.E.2d 1255, ¶ 16 (10th Dist.) (motions for summary judgment and directed verdicts address the same issues, just at different litigation stages); *Tsocaris v. Cincinnati Ins. Co.*, 2d Dist. Montgomery No. 11551, 1990 WL 492, *2 (Jan. 8, 1990) (both situations involve lack of proof of material fact).

{¶ 109} As a preliminary point, whether rebuttal opinions were allowed due to a scheduling order is essentially irrelevant. Even if they were, the trial court was entitled to reject the reports if it found that the affidavits of which they were a part (and which were submitted in opposition to Evenflo's summary judgment motion) were improper. This relates to Appellants' final argument, which is that the trial court erred in finding that the affidavits were sham affidavits. In *Pettiford*, 126 Ohio St.3d 413, 2010-Ohio-3237, 934 N.E.2d 913, the Supreme Court of Ohio held that "[a]n affidavit of a retained, nonparty expert contradicting the former deposition testimony of that expert and submitted in opposition to a pending motion for summary judgment does not create a genuine issue of material fact to prevent summary judgment unless the expert sufficiently explains the reason for the contradiction." *Id.* at syllabus, applying *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47.

{¶ 110} Previously, in *Byrd*, the court had addressed whether a party's affidavit that conflicted with prior deposition testimony should be considered in deciding a

summary judgment motion.   *Pettiford* at ¶ 20.   In *Pettiford*, the court explained that due to differences in the positions of movants and nonmovants (who are given the benefit of inferences in their favor), *Byrd* had adopted the following rule for nonmovants:

> "With respect to a nonmoving party, the analysis is a bit different.   If an affidavit appears to be inconsistent with a deposition, the court must look to any explanation for the inconsistency.   We do not say that a nonmoving party's affidavit should always prevent summary judgment when it contradicts the affiant's previous deposition testimony.   After all, deponents may review their depositions and correct factual error before the depositions are signed."   *Byrd*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, at ¶ 26–27.
>
> We therefore held, "An affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat a motion for summary judgment."   *Id.* at paragraph three of the syllabus.

*Pettiford* at ¶ 25-26.

{¶ 111} In deciding to extend the sham affidavit rule to expert witnesses of a party, the court outlined various differences between lay witnesses and non-party expert witnesses.   *Id.* at ¶ 29-32.   Among these differences were: (1) party experts are retained and compensated by parties and their attorneys; (2) these experts are hired to review cases and offer opinions on essential material elements and are subject to more

restrictive discovery and evidentiary rules than fact witnesses; (3) a party's attorney "directs the expert as to the subject matter upon which an opinion is needed, helps to determine what evidence the expert reviews, and works closely with the expert throughout the litigation to prove or defend against the causes of action"; (4) while attorneys do not represent experts, they often act as if they do, by objecting and rehabilitating the expert if needed, or if dissatisfied, clarifying depositions on the record; and (5) experts have the right under Civ.R. 30(E) to correct errors in form or substance, and give reasons for corrections, and a party's attorney often assists with this process. *Id.* The court stressed in this regard that "[i]f a retained, nonparty expert is permitted to defeat summary judgment at the eleventh hour by changing his or her opinions without a sufficient explanation, summary judgment will be rendered meaningless." *Id.* at ¶ 34.

**{¶ 112}** That statement rings true here. As noted, Dr. Khandelwal received the expert reports of Drs. Bernal and Gwin on July 1, 2022, about two weeks before his deposition, and he indicated at his deposition that he had reviewed them. The remaining materials provided to Dr. Khandelwal after his deposition included items that had been available for him to review before his deposition and could have been provided to him for review. According to Appellants' brief, several records, including Shawna's Wake Forest hospital records and the expert reports of Drs. Bernal and Gwin were not available at the time of Dr. Khandelwal and Dr. Shiener's initial reports, which were both written on May 2, 2022. Appellants' Brief at p. 19, fn. 7. This is somewhat of a red herring, as the expert reports *were available* around two weeks before the depositions. And, as noted, Dr. Khandelwal saw the reports.

{¶ 113} Furthermore, from Appellants' summary judgment response, it appears that the Wake Forest records were also available before Dr. Khandelwal's deposition. *See* Plaintiffs' Response at p. 37.   Appellants have not said they were unable to give the Wake Forest records to Dr. Khandelwal at some point between when he wrote his report in early May and the date of his deposition in mid-July, more than two months later.   Dr. Khandelwal also stated during his deposition that there was no particular reason he had not reviewed Shawna's records; he believed that was something he noticed later and "failed" to mention.   Dr. Khandelwal Depo. at p. 15.   Finally, Dr. Shiener did not review Shawna's medical records; he only reviewed the expert reports of Drs. Bernal and Gwin. Ex. 47, Shiener Rebuttal Report at FROST-409738.

{¶ 114} The point here is that an expert's failure to review available records or a party's failure to send records to an expert are not reasons for submitting an affidavit that contradicts the expert's prior testimony.   Furthermore, Dr. Khandelwal never offered an explanation for why he contradicted his deposition; in fact, his affidavit and rebuttal report never mentioned a reason for changing his opinions.   Likewise, Dr. Shiener never offered a reason for inserting an opinion about Tristan that literally was not even connected to his former testimony.

{¶ 115} In addition, Dr. Khandelwal completed an errata sheet and chose not to correct any of his opinions.   He made only three minor wording corrections, none of which related to the points in his rebuttal opinion.   Notably, the doctor signed this errata sheet on August 16, 2022, which was well after his deposition was taken and was about a month after his "rebuttal report" was submitted.   *See* Ex. E attached to Plaintiffs'

Memorandum in Opposition to Defendant's Motion in Limine to Exclude Certain Opinions of Dr. Anjay Khandelwal, M.D., Filed Under Seal. Thus, Dr. Khandelwal had ample time to correct errors in his deposition (a point stressed in *Pettiford*) but failed to do so. Accordingly, the trial court did not err in applying the sham affidavit rule and in refusing to consider the rebuttal opinions.

{¶ 116} Based on the preceding discussion, the first and second assignments of error are overruled.

## IV. Lack of Need for Expert Testimony

{¶ 117} Appellants' Third Assignment of Error states as follows:

Expert Testimony Is Not Required for a Reasonable Jury to Conclude That a Child Will Experience Conscious Pain and Suffering When the Child Is on Fire, and Summary Judgment Was Otherwise Improper Where the Testimony and Medical Records Create a Triable Issue of Material Fact as to the Children's Pain and Suffering, Additional Injuries, and Ultimate Deaths.

{¶ 118} Under this assignment of error, Appellants contend that medical testimony to prove causation was not required because a layperson could observe that Tristan had suffered horrible injuries that caused extraordinary pain. There is no question that this was a terribly tragic case; no one would argue otherwise. Nonetheless, the arguments Appellants make here are the same ones that have already been rejected. The fact that injuries may be obvious in certain situations is not the same as concluding that an

opposing party's acts proximately caused those injuries. Ohio law is replete with situations in which a party was clearly injured in an incident but failed to establish that the defendant's alleged negligence or wrongful act (as in strict liability) proximately caused the injury.

{¶ 119} "Generally, causation is a question of fact for the jury; however, before the question may be submitted to the jury, the plaintiff must present some evidence of causation." *Rieger v. Giant Eagle, Inc.*, 157 Ohio St.3d 512, 2019-Ohio-3745, 138 N.E.3d 1121, ¶ 11, citing *Renfroe v. Ashley*, 167 Ohio St. 472, 150 N.E.2d 50 (1958). In *Rieger*, the plaintiff was clearly injured when she was hit by a motorized cart driven by a Giant Eagle customer. *Id.* at ¶ 2. However, that did not mean that Giant Eagle was responsible.

{¶ 120} "Causation is established using the 'but for' test. * * * A defendant's conduct is the cause of the harm if the harm would not have occurred but for the defendant's act or failure to act. * * * It is not enough for the plaintiff to assert or speculate that the defendant's actions or failure to act might have caused the injury * * * There must be evidence of causation before the plaintiff's negligence claim may be submitted to the jury." (Citations omitted). *Id.* at ¶ 12. The same principles apply to product liability claims.

{¶ 121} In *Rieger*, the plaintiff presented evidence that Giant Eagle knew of 117 incidents involving its motorized carts. *Id.* at ¶ 14. The Supreme Court of Ohio commented that, even if the plaintiff had established a duty to the plaintiff, there was no evidence of causation. In this regard, the court stated:

Rieger asserts that Giant Eagle breached its duty to Rieger, a business invitee, by failing to take any action to protect her from the negligence of other customers who had not been instructed on how to use the motorized carts and that had Giant Eagle properly instructed the motorized-cart users, Rieger's accident could have been prevented. This is speculation. Rieger presented no evidence that the cause of the prior 117 incidents was due to motorized-cart drivers' lack of instruction and training. Likewise, Rieger presented no evidence that Giant Eagle's lack of instruction and training was the cause of the accident in her case. Because there is no evidence of causation, the court of appeals should have reversed the trial court's denial of Giant Eagle's motion for a directed verdict on Rieger's negligence claim.

*Id.* at ¶ 15.

**{¶ 122}** Such causation problems occur in many cases. An admitted injury occurs, but causation is lacking. As previously explained, Shawna was outside the car before Kristina attempted to extricate Tristan, so the buckle defect could not possibly have caused her injuries. And, as we previously noted, Appellants' contention that "Kristina testified that Shawna was not out of the vehicle and walking toward her until after she abandoned her attempts to rescue Tristan" is a misconstruction of the evidence. This was not Kristina's testimony.

**{¶ 123}** Similarly, the fact that Tristan was injured did not mean that Evenflo caused his injury and death or that there was a genuine issue of material fact on this point

precluding summary judgment. For the reasons stated previously, Dr. Khandelwal could not say with any degree of probability that Tristan would have survived even if Kristina had been able to extricate him when she first tried, nor could he say that Tristan was even conscious. As Evenflo points out, how many times Kristina pushed the buckle mechanism, or for how long, was irrelevant and did not affect the lack of evidence on the injuries Tristan suffered. Evenflo Brief at p. 21.

**{¶ 124}** Accordingly, the third assignment of error is overruled.

IV. Contamination Claim

**{¶ 125}** Appellants' fourth assignment of error states that:

> The Trial Court Erred in Limiting Appellants' Failure-to-Warn Claim
>
> to Contamination and in Granting Summary Judgment on That Ground.

**{¶ 126}** Under this assignment of error, Appellants contend the trial court erred in implicitly determining that the only defect that Evenflo failed to warn about was contamination. In this regard, Appellants argue that Evenflo knew of other defects that caused the buckle to fail to open during normal use, and that if Evenflo had placed a warning on the seat that it might not open in case of an emergency, "the Frosts would not have used the car seat or would have been able to open it more quickly." Appellants' Brief at p. 22.

**{¶ 127}** At the page Appellants have cited, the trial court's decision stated, with respect to the contamination claim, that:

> Because Plaintiffs must establish that a defective condition was the

proximate cause of their harm, it is incumbent upon them to identify evidence that shows the alleged contamination defect was present at the time of this tragic incident. *See Atkins*, 132 Ohio App.3d at 562. There is no evidence that the buckle was contaminated at the time of the incident. Although she stated she did not clean the buckle, Tammy Frost [Kristina's mother] testified that she wiped the car seat straps with a household cleaner and that it was not soiled when Kristina took it on July 3, 2018. (Tammy Frost Dep. at 36, 42-44; Kristina Dep. at 36, 41-42, 135). Richard Frost testified that he put the car seat in the car on the date of the incident and the seat was clean. (Richard Frost Dep. at 64, 68). Even without specific evidence that the buckle had been cleaned, there is no evidence before the Court to show a triable issue that the buckle was contaminated. Therefore, the Court grants Evenflo summary judgment on Plaintiffs' design defect claim based on contamination.

(Footnote omitted.) Decision at p. 31-32.

{¶ 128} In view of our decision that there were no genuine issues as to proximate cause for the children's injuries and deaths, this assignment of error is moot and need not be considered. The fourth assignment of error is overruled.


V. Conclusion

{¶ 129} Appellants' first, second and third assignments of error having been overruled, and the fourth assignment of error having been overruled as moot, the

judgment of the trial court is affirmed.

. . . . . . . . . . . . .


LEWIS, J. and HUFFMAN, J., concur.