[Cite as *Moore v. Mercy Med. Ctr.*, 2024-Ohio-2610.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CHERI SHEREE MOORE, Individually and in her capacity as Parent, Natural Guardian, and Next Friend of P.C.M., a minor | JUDGES:<br>Hon. W. Scott Gwin, P.J.<br>Hon. John W. Wise, J.<br>Hon. Craig R. Baldwin, J. |
| Plaintiff-Appellant | |
| -vs- | Case No. 2023 CA 00145 |
| MERCY MEDICAL CENTER, et al. | |
| Defendants-Appellees | O P I N I O N |

CHARACTER OF PROCEEDING:     Civil Appeal from the Court of Common
                             Pleas, Case No.  2022 CV 00029

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      July 8, 2024

APPEARANCES:

For Plaintiff-Appellant              For Defendant-Appellee Dr. Meniru

THOMAS P. RYAN                       JEANNE M. MULLIN
DANIEL J. RYAN                       MATTHEW J. TURKALJ
RYAN, LLP                            PEREZ & MORRIS
55 Public Square, Suite 2100         1300 East Ninth Street
Cleveland, Ohio  44113               Cleveland, Ohio  44114

LOUIS E. GRUBE                       For Defendant-Appellee Dr. Domingo
KENDRA DAVITT
FLOWERS & GRUBE                      KEVIN M. NORCHI
Terminal Tower                       STEVE FORBES
40th Floor                           FREEMAN MATHIS & GARY, LLP
50 Public Square                     23240 Chagrin Boulevard, Suite 210
Cleveland, Ohio  44113               Cleveland, Ohio  44122

*Wise, J.*

**{¶1}**    This medical malpractice appeal arises out of the labor and delivery of P.C.M. on May 29, 2015 at Mercy Medical Center.  The appeal brought by plaintiff-appellant Cheri Sheree Moore, individually and on behalf of her child, alleges error in two judgments of the Stark County Common Pleas Court that granted the motion to strike the affidavit of Martin Gubernick, M.D. filed by Moore in response to defendant-appellee's motion for summary judgment and that granted the motion for summary judgment filed by defendant-appellee Godwin Meniru, M.D.

### MEDICAL BACKGROUND

**{¶2}**    Plaintiff-Appellant Moore challenges the medical care and treatment rendered to her and P.C.M.  by defendant-appellee Godwin Meniru, M.D. beginning on the evening of May 27, 2015 when Moore, in late pregnancy, was brought by ambulance to Mercy Medical Center when her membranes ruptured. Moore reported the rupture occurred on May 26, 2015 around 11:00 pm.

*Day One – May 27 2015*

**{¶3}**    Moore was admitted to Mercy Medical Center that evening under the care of Meniru, who was the attending physician on duty that day for clinic obstetric patients. Her gestational age was determined to be 37 weeks. To induce labor, Meniru instructed the nursing staff to administer between zero and twenty milliunits per minute of Pitocin. The instructions were to increase the dosage as needed until contractions were two to three minutes apart.

**{¶4}**    Meniru' s shift ended at 7:00 am the next day.

*Day Two – May 28, 2015*

**{¶5}** Moore continued in labor the next day and her care was transferred to Albert T. Domingo, M.D. at the 7:00 am shift change. Domingo visited Moore around the beginning of his 24-hour shift. Domingo ordered the Pitocin increased to thirty milliunits per minute as needed to induce labor. Domingo spent much of his shift outside the hospital at his off-site office and at his home. He did not review P.C.M.'s fetal monitor tracings and relied on the nurse staffing for updates on Moore's care.

**{¶6}** Moore continued in labor that morning and the remainder of the afternoon.

**{¶7}** Around 4:36 pm, Meniru electronically signed an order for Pitocin to be administered between zero and twenty milliunits per minute. It is not disputed that Meniru was physically present at the hospital either on the labor and delivery floor or in the medical records department. In his deposition taken in 2023, he stated he did not remember if he saw Moore.

**{¶8}** By 6:00 pm, there were clear signs of fetal intolerance to labor and excessive urine activity. The nursing staff increased the Pitocin to as high as 28 milliunits per minutes around 9:00 pm.

**{¶9}** During the evening, fetal monitoring strips continued to indicate significant fetal intolerance and excessive urine activity. These stresses progressed to prolonged decelerations of P.C.M.'s heart rate.

**{¶10}** The nursing staff continued to monitor Moore and P.C.M., and she was not seen by Domingo again that day.

**{¶11}** It is undisputed that Domingo was the attending physician that day. The nursing staff reported any changes or progressions in Moore's delivery to Domingo.

*Day Three – May 29, 2015*

{¶12}   Moore continued in labor that morning.  At 7:00 am, Meniru took over again as Moore's attending physician.  He ordered by telephone that the Pitocin be stopped and the last Pitocin Moore received to induce labor was at 7:27 am.

{¶13}   At 7:32 am, Meniru was notified by the nursing staff that P.C.M.'s heart was monitored by the fetal monitoring strips and exhibited prolonged decelerations several times.

{¶14}   He told the nursing staff he would be coming to the hospital immediately.

{¶15}   At 8:20 am, a third telephone call was placed by the nursing staff to Meniru when P.C.M.'s heart rate was charted as "decelerating into the 60's" and the infant, P.C.M., had only progressed partway through the birth canal.

{¶16}   Meniru arrived at the hospital and examined Moore at 8:37 am.  Moore recalled Meniru saying "Oh my God, you should have already had this baby."

{¶17}   Meniru ordered an emergency caesarian section at 8:41 am when he observed a high fetal station, poor prognosis of labor, fetal bradycardia and obstructed labor. The operative report listed pre-operative conditions of "[p]rolonged rupture of membranes, prolonged labor, high fetal station, obstructed labor and nonreassuring fetal condition."

{¶18}   General anesthesia was administered to Moore at 8:48 am and the first incision was made at 8:56 am.  P.C.M., a boy, was delivered around 8:57 am by Meniru. P.C.M weighed six pounds, one ounce. He was intubated and taken to Akron Children's Hospital where he was ultimately diagnosed with multiple medical complications.

**PROCEDURAL BACKGROUND**

**{¶19}** On January 11, 2022, Moore filed a pro se complaint individually and on behalf of her son naming Mercy Medical Center and Drs. Domingo and Meniru as defendants. While Moore named Meniru as a defendant, her complaint alleged no specific negligent acts by Meniru.

**{¶20}** After retaining counsel, her complaint was amended on March 18, 2022. with an affidavit of merit signed by Frederick Gonzalez, M.D., an OB/GYN standard of care expert.

**{¶21}** Moore alleged that Drs. Domingo and Meniru were negligent in failing to order a caesarian section earlier, which resulted in permanent and substantial injuries to P.C.M.

**{¶22}** Moore also alleged negligence by the hospital and nursing staff.

**{¶23}** Discovery commenced and Moore identified her experts including Martin Gubernick, M.D., a Board-Certified OB/GYN. Moore produced an expert report in compliance with Civ. Rule 26(B) prepared by Dr. Gubernick. Dr. Gubernick opined, in his expert report dated November 16, 2022, that Dr. Domingo, Dr. Meniru and the nursing staff all deviated from good and acceptable practice by not advocating for a c-section in the evening of 5-28-2015. (Plaintiff's opposition to Meniru' s motion for summary judgment, Exh.2 to Exh. 5 filed April 18, 2023.)

**{¶24}** The deposition of Meniru was taken on March 6, 2023.

**{¶25}** On that same day - March 6, 2023 - Meniru filed a motion for summary judgment alleging he was entitled to summary judgment because Moore's expert, Dr.

Gubernick, failed to state in his report that Meniru failed to breach the standard of care and cause injury to P.C.M.

{¶26} In support of his motion, Meniru attached, inter alia, his own affidavit claiming that he was not involved with the management and care of Moore and P.C.M. at the time Dr. Gubernick opined in his report of November 16, 2022, that a caesarian should have been ordered.

{¶27} Moore requested and received additional time to respond to Meniru's motion for summary judgement. As reasons for the request, Moore explained that the deposition testimony of Meniru was not transcribed until March 17, 2023 and her expert, Dr. Gubernick, needed additional time to review the deposition testimony. The request was granted by the trial court.

{¶28} On April 18, 2023, Moore responded to Meniru's motion for summary judgment. In response, Moore attached an affidavit signed by Dr. Gubernick that incorporated his expert report of November 16, 2022. He also, for the first time, offered an additional opinion, that a caesarian delivery should have been ordered on May 29, 2015 by Meniru within thirty minutes of being notified of fetal distress.

{¶29} Meniru then filed a motion to strike the April, 2023 affidavit of Dr. Gubernick. Meniru claimed, inter alia, that Dr. Gubernick's affidavit of April, 2023 was a "sham affidavit".

{¶30} On June 26, 2023, the trial court entered a three-page judgment entry granting Meniru' s motion to strike the April, 2023 affidavit of Dr. Gubernick and granting the motion for summary judgment filed by Meniru on March 6, 2023.

**{¶31}** The trial court characterized the April, 2023 affidavit of Dr. Gubernick as a "contradictory affidavit" saying "[o]nly now, when it has become an issue before the Court, has Dr. Gubernick suddenly determined that Dr. Meniru' s actions fell below the standard of care." The trial court characterized Dr. Gubernick's affidavit as a "sham affidavit" inconsistent with a prior expert report and/or deposition testimony. (Judgment Entry, June 26, 2023).

**{¶32}** Later, Moore dismissed the remaining defendants and the Ohio Department of Medicaid filed a motion dismissing its cross claims. This appeal follows arguing two assignments of error.

### ASSIGNMENTS OF ERROR

**{¶33}** "I.    THE TRIAL COURT ERRED AS A MATTER OF LAW BY DECLARING THE AFFIDAVIT OF DR. MARTIN GUBERNICK, M.D., TO BE A "SHAM" AND ABUSED ITS DISCRETION BY STRIKING IT.

**{¶34}** "II.    THE TRIAL COURT ERRED BY AWARDING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT DR. GODWIN I. MENIRU."

### LAW AND ANALYSIS

#### I. Motion to Strike Affidavit was not abuse of discretion

*Standard of Review on Motion to Strike*

**{¶35}** A trial court's ruling concerning the admission of expert testimony of opinion is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *Beattoe v. McCoy,* 2018-Ohio-2535, ¶25 (1st Dist.). Moore's claim that this Court should review the trial court's ruling on the motion to strike de novo because it was combined with a motion for summary judgment is not our established precedent.

*Campagne-McGuffin v. Diva Gymnastics Academy,* 2022-Ohio-3885, ¶ 20 (5th Dist.) ("Pursuant to our established precedent, we review the trial court's striking of the affidavits under an abuse of discretion standard.").

{¶36}   Abuse of discretion is defined as more than an error of law, but a decision that is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217 (1983). A trial court does not abuse its discretion in striking an affidavit by an expert that is filed for the first time in response to a motion for summary judgment. *Myers v. John A. Hudec Dental Ctr. Inc*, 2022-Ohio-80, at ¶ 33. (8th Dist.).

{¶37}   A reviewing court is not free to substitute its judgment for the trial court. *Noko v. Fairview Gen. Hosp.,* 1996-Ohio-159.

{¶38}   With that standard in mind, we review the trial court's ruling striking the affidavit of Dr. Gubernick attached to Moore's response to Meniru's motion for summary judgment.

{¶39}   Here, the trial court found that Dr. Gubernick's affidavit directly addressing Moore's claims against Meniru was a "sham affidavit" contradictory or inconsistent with his expert witness report.

*The "sham affidavit" doctrine*

{¶40}   The "sham affidavit" doctrine precludes a party from creating an issue of fact to prevent summary judgment by submitting an affidavit that directly contradicts previous sworn testimony of the affiant.

{¶41}   The doctrine is generally thought to have originated in the federal case of *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 577-78 (C.A.2, 1969). In *Perma,* the United States Second District Court of Appeals held that a contradictory

affidavit failed to raise a genuine issue of material fact when Perma Research's president testified in deposition that he could not recall an instance in which the adverse party's employees had behaved fraudulently. *Id.* at 577-78. Later, in response to summary judgment, he submitted an affidavit stating that these same employees "never had any intention of performing their contract with Perma Research." *Id* at 577.

**{¶42}** The Court of Appeals held that the trial court properly granted the summary judgment dismissing fraud claims saying "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* at 577-78.

**{¶43}** Since *Perma,* federal district courts of appeals and state courts have adopted some form of the sham affidavit doctrine.

**{¶44}** In *Byrd v. Smith,* 2006-Ohio-3455, ¶ 8, the Ohio Supreme Court addressed whether a party's affidavit that conflicted with prior deposition testimony should be considered in deciding a summary judgment motion. The Court held that "[A]n affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party, may not, without sufficient explanation, create a genuine issue of material fact to defeat the motion for summary judgment." *Id.* at paragraph 2 of the syllabus. With respect to a nonmoving party, the Court explained that the analysis is a bit different:

> If an affidavit appears to be inconsistent with a deposition, the court must look to any explanation for the inconsistency. We do not say that a nonmoving party's affidavit should always prevent summary judgment when it contradicts the affiant's previous deposition testimony. After all, deponents

may review their depositions and correct factual error before the depositions are signed." *Id.* at ¶ 26-27.

**{¶45}** The issue of contradictory affidavits by expert witnesses was not before the *Byrd* Court.

**{¶46}** In *Pettiford v. Aggarwal,* 2010-Ohio-3237, the Ohio Supreme Court extended the *Byrd* holding to nonparty expert witnesses. It held that "[a]n affidavit of a retained, nonparty expert contradicting the former deposition testimony of that expert and submitted in opposition to a pending motion for summary judgment does not create a genuine issue of material fact to prevent summary judgment unless the expert sufficiently explains the reason for the contradiction". *Id.* at syllabus.

**{¶47}** In response to the argument that counsel cannot prevent a nonparty expert from deliberately or inadvertently misstating facts during a deposition, the *Pettiford C*ourt explained the various differences between lay witnesses and non-party expert witnesses. *Id.* at ¶ *29-32.* Among these differences were: (1) party experts are retained and compensated by parties and their attorneys; (2) these experts are hired to review cases and offer opinions on essential material elements and are subject to more restrictive discovery and evidentiary rules than fact witnesses; (3) a party's attorney directs the expert as to the subject matter upon which an opinion is needed, helps to determine what evidence the expert reviews, and works closely with the expert throughout the litigation to prove or defend against the causes of action; (4) while attorneys do not represent experts, they often act as if they do, by objecting and rehabilitating the expert if needed, or if dissatisfied, clarifying depositions on the record; and (5) experts have the right under

Civ.R. 30(E) to correct errors in form or substances, and give reasons for corrections, and a party's attorney often assists with this process. *Id.* at ¶¶ 31-32.

{¶48} The Court stressed that "[i]f a retained, nonparty expert is permitted to defeat summary judgment at the eleventh hour by changing his or her opinions without a sufficient explanation, summary judgment will be rendered meaningless" *Id.* at ¶ 34. See also *Frost v. Evenflo Company, Inc.,* 2023-Ohio-4561, ¶ 111 (2nd Dist.).

{¶49} The sham affidavit doctrine is not limited to changes in deposition testimony. It applies to conflicts between affidavits and interrogatory responses as well as deposition testimony. *School Dist. No. 1J Multnomah County Oregon v. AGands, Inc.,* 5 F.3d 1255, 1254 (9th Cir., 1993); Intimate Bookshop v. Barnes & Noble, Inc., 2003 WL 22251312 at *9 (S.D.N.Y. Sept. 30, 2003) (disregarding declarations that inexplicably contradicted statements plaintiff made in its complaint and answers to defendant's interrogatories, through its expert's reports and no deposition testimony).

{¶50} A "sham affidavit" is a term of art that does not imply an actual sham. It simply implies a contradictory affidavit offered for the purposes of defeating summary judgment. Without weighing the evidence or credibility, the trial court can disregard the affidavit as not genuine in ruling on a motion for summary judgment. *Lujan v. Navistar, Inc.,* 555 S.W.3d 79 (Tex. 2018), reh'g denied (Sept. 28, 2018).

{¶51} Without using the term "sham affidavit", this Court has recognized the doctrine of a contradictory affidavit being used to defeat a motion for summary judgment. In *Zanesville Truck Ctr. V. Burech & Crow,* 2004-Ohio-6278, ¶ 60 (5th Dist), the issue in the context of a legal malpractice claim was whether or not a contradiction existed between an expert's deposition testimony and subsequent affidavit where the expert added

opinions on the issue of standard of care.  This Court held that the affidavit attached to the summary judgment contradicted rather than supplemented or clarified the deposition testimony. See also *Thornsley v. Lafferty's Coin Op. Laundry L.L.C.,* 2022-Ohio-3907, ¶ 36 (5th Dist.) (holding that the trial court did not abuse its discretion in striking an affidavit that contradicted deposition testimony of a party when the party offered no explanation for the contradiction).

*Application of "Sham Affidavit" Doctrine to Dr. Gubernick's affidavit*

**{¶52}**  In responding to Meniru' s motion for summary judgment, Moore was required to show that genuine issues of material fact existed concerning Meniru's treatment of Moore during labor and birth of P.C.M. In short, Moore needed to demonstrate that there was a genuine issue of material fact that there was a causal link between the delayed caesarian delivery and P.C.M.'s respiratory distress requiring intubation and resulting injuries.

*April 4, 2023 Affidavit of Dr. Gubernick*

**{¶53}**  Moore produced the affidavit of Dr. Gubernick signed in front of a notary public on April 4, 2023.  In his four-page affidavit, Dr. Gubernick addressed the methods in which he believed Meniru fell below the standard of care in the labor of Moore and delivery of P.C.M.:

> 21.  Dr. Meniru took over the care of the patient at around 7:00 on 5-29-15.
>
> ....

28. The standard of care of an attending OBGYN requires the ability to respond and perform a caesarian delivery within 30 minutes of being notified of fetal distress.

29. Dr. Meniru was notified at 7:27 AM and again at 7:32 AM of fetal distress. He ordered the Pitocin to be stopped, but he did not arrive until 8:37 AM.

30. At a minimum, Dr. Meniru fell below the standard of care by failing to begin a caesarian delivery within 30 minutes of receiving reports of fetal distress.

31. It is my opinion, based upon the available information, records, and the review summarized above, it is more likely than not that that [sic] the standard of care was not met and/or had been breached by Dr. Godwin Meniru and these deviations caused and contributed to [P.C.M.]'s injuries.

32. At a minimum, Dr. Meniru fell below the standard of care by failing to begin a caesarian delivery within 30 minutes of receiving reports of fetal distress.[1]

33. The delay in performing a caesarian delivery caused and contributed to the respiratory distress of the child.

34. Timely response and caesarian delivery by Dr. Meniru would have prevented the need for intubation and subsequent injuries.

---

[1] According to the medical records, the emergency caesarian was ordered at 8:41 am.

35. Had the appropriate standard of care been followed by Dr. Meniru, it is more likely than not that the respiratory distress at birth would have been avoided and the intubation would not have occurred.

36. I retain the right to modify these opinions based upon any additional information provided to me.

*November 16, 2022 Expert Report*

{¶54} On November 16, 2022, in response to Civ.R. 26, Moore submitted the expert report of Dr. Gubernick.

{¶55} Dr. Gubernick opined:

By 1800 of 5-28-2015, there was clear signs of fetal intolerance to labor and excessive urine activity.

Dr. Domingo was notified multiple times concerning the protraction of labor as well as a non-reassuring tracing. Despite the updates, Dr. Domingo failed to personally evaluate the fetal tracing and labor progress. By midnight, prolonged decelerations occurred. Although the Pitocin was reduced to 14mu (it had been as high as 28 mu) there remained evidence of excessive uterine activity as well as fetal intolerance to labor. The prolonged deceleration reoccurred several times during the am hours of 5-29-2015. Transfer of care returned to Dr. Meniru in the morning of 5-29-2015 at about 0700. Ultimately, Dr. Meniru made the decision to perform a c-section at 0841. At 0859 a male weighing 6lbs 1oz. was born with apgars of 5.7. The indication documented for the c-section was obstructed labor,

Commented [DMG1]:

high station, poor labor and fetal bradycardia. The child required intubation and was ultimately diagnosed with multiple medical complications.

It is my opinion that the care Ms. Moore received at the Mercy Hospital during her 2015 admission was below standard of good and acceptable practice. By 1800 of 5-28-201[sic], the fetal tracing required Pitocin to be turned off, additional fetal resuscitation performed and if the fetal tracing as well as the contractions pattern not improved, a c-section was required. Dr. Domingo, Dr. Meniru, the nursing staff all deviated from good and acceptable practice by not advocating for a c-section in the evening of 5-28-2015. The standard of care required a c-section by 1900 if the tracing did not return to reassuring. Had the c-sections been performed by 1900 on 5-28-2015, more likely than not, the child would not have required intubation, and all injuries that occurred as a result of his intubation would have been avoided. At this point, pending further information, I reserve my option as to whether this child sustained an intrapartum neurologic injury as a result of the delay in performing the c-section.

*Comparison of report and affidavit of Dr. Gubernick*

{¶56} Dr. Gubernick opined in his expert report of November, 2022, that the standard of care required a c-section by 1900 on May 28, 2015 "if the tracing did not return to reassuring." Moore does not argue that the tracing ever returned to acceptable parameters. So, too, Dr. Gubernick's expert report contains no specific opinion on what Meniru should have done other than a broad conclusory statement that the nursing staff, Dr. Domingo and Dr. Meniru did not meet the standard of care. "Dr. Domingo, Dr. Meniru,

the nursing staff all deviated from good and acceptable practice by not advocating for a c section in the evening of 5-28-2015."

{¶57} (Report, Nov. 16, 2022 at 2, Exh. 2 to Exh. 5 of Plaintiff's Opposition to Motion for Summary Judgment, April 18, 2023.)

{¶58} In contrast, Dr. Gubernick opined in his Affidavit of April 4, 2023 attached to plaintiff's opposition to Meniru's summary judgment motion that Meniru fell below the standard of care by failing to begin a caesarian delivery within 30 minutes of receiving reports of fetal distress on May 29, 2015. "Timely response and caesarian delivery by Dr. Meniru would have prevented the need for intubation and subsequent injuries." (Affidavit, April 4, 3023 at ¶ 34-35).

{¶59} Meniru took over the care of Moore at 7:00 am on May 29, 2015 and ordered an emergency caesarian at 8:41 am. In the same affidavit, Dr. Gubernick stood by his opinions of November 16, 2022 with further specificity and additional opinions.

{¶60} (Affidavit, April 4, 2023 at 2, Exh. 5 to Plaintiff's Opposition to Motion for Summary Judgment, April 18, 2023.

{¶61} The trial court found that Dr. Gubernick's original expert report does not "speak to Dr. Meniru breaching any standard of care by not performing a c-section in a timely fashion, but now in his affidavit, he opined that this delay caused and/or contributed to [PM's] injuries." (Judgment Entry, June 26, 2023 at 2).

{¶62} We agree with the trial court that the information contained in the affidavit of Dr. Gubernick offers a new and contradictory opinion as to Meniru's failure to meet the standard of care.

{¶63} But our analysis does not stop there. Under the Ohio Supreme Court holdings in *Byrd and Pettiford,* when an affidavit submitted opposing summary judgment contradicts former testimony, it does not always prevent summary judgment if the nonmoving party can offer a reason for the inconsistency. "A nonmoving party's contradictory affidavit must sufficiently explain the contradiction before a genuine issue of material fact is created." *Byrd,* at ¶ 29, 2006-Ohio-3455.

{¶64} As set forth above, the trial court did not err in finding that Dr. Gubernick's expert report and affidavit are contradictory. We now review Moore's reasons for the inconsistency.

*Meniru signed an order for Pitocin on May 28, 2022*

{¶65} Moore argues that Meniru was physically located in the hospital the afternoon of May 28, 2015 and signed an order for Pitocin at 4:36 pm. Therefore, according to Moore, there is a question of fact as to whether Meniru was involved in Moore's care on May 28, 2015 when Dr. Gubernick first opined a caesarian should have been performed by 7:00 pm.

{¶66} But Moore cannot dispute that Domingo was the attending physician that day and responsible for Moore's care. Since Moore was a "clinic" patient, Domingo was the only one covering on May 28, 2015 for the "clinic patients". (Domingo Dep. at 45). And no nurse, at any point in time between 7:00 am May 28 and 7:00 am May 29, ever told Moore they were trying to reach Meniru or that he was involved in her care in any way. (Moore Dep. at 133-134). So, too, the medical records do not show that the nursing staff communicated by telephone or otherwise with Meniru on May 28, 2015. And Meniru states in his deposition and affidavit that he was not involved in Moore's care and treatment

during the critical period Dr. Gubernick first opined that the standard of care required a caesarian section on May 28, 2015. (Meniru Dep. at 97). So, too, Dr. Gubernick, in both his expert report and his affidavit, concedes that Moore's care was transferred to Domingo on the morning of May 28, 2015 at 7:00 am.

**{¶67}** Meniru offered an explanation as to why the medical records showed his e-signature for Pitocin on 5/28/2015:

[Meniru]: When the patient came in and I assessed her. I gave orders for Pitocin...

That would have been a verbal order.

But with that verbal order, the nurses will start giving her Pitocin ... on the patient ...

They could enter the order as a verbal order and then I would sign it later ...

To keep up with my records, I will sign records any time I was around and had access to the record. (Meniru Dep. at 95-96).[2]

**{¶68}** In short, the medical records that show that Meniru e-signed an order for Pitocin on May 28, 2015 at 4:36 pm does not demonstrate that he was Moore's attending physician or responsible for her care and treatment during the critical period Dr. Gubernick first opined a caesarian section was required.

---

[2] Similarly, the medical records show an e-signature for Domingo on May 30, 2015, the date after P.C.M. was delivered. There is no evidence that Domingo ever saw Moore after the delivery of P.C.M. (Domingo Dep. at 86-87.)

*Affidavit of Dr. Gubernick based on newly discovered evidence*

**{¶69}** Moore argues that Dr. Gubernick based his affidavit of April, 2023 on new evidence. Dr. Gubernick stated in his affidavit that after writing his expert report, he reviewed the depositions of Meniru, Nurse Allen and Nurse Pettay. He also reviewed the curriculum vitae and reports from Meniru's expert Michael Cackovic and the affidavit of Meniru attached to Moore's motion for summary judgment.

**{¶70}** Moore points to the leave granted by the trial court at her suggestion for additional time to oppose Meniru' s motion for summary judgment. (Moore's brief at 20).

**{¶71}** Yet Moore points to no "additional evidence" in Meniru' s deposition or other new materials that led Dr. Gubernick to conclude that Meniru violated his duty of care to Moore by not performing a caesarian on May 29, 2015 within 30 minutes of being notified of fetal distress. [3]

**{¶72}** The medical records showing the e-signature of Meniru on May 28, 2015 were available to Dr. Gubernick for review before he wrote his expert report in November, 2022. And he concluded that Domingo was Moore's attending physician responsible for her treatment and care. Indeed, he spent a paragraph outlining that Domingo was notified multiple times during the day of Moore's protracted labor and non-reassuring tracing.

**{¶73}** Nowhere in Dr. Gubernick's affidavit of April, 2023 does he explain the new evidence he encountered to explain his contradictory theory that Meniru breached the standard of care by not ordering a caesarian section within 30 minutes of being notified of fetal distress on May 29, 2015. He does not explain what he read in Meniru's deposition or the nurses' depositions that altered his opinion so drastically to opine that it was Meniru

---

[3] Meniru ordered a caesarian 69 minutes after the nurse alerted him to fetal distress.

who breached the standard of care on May 29, 2015. Likewise, Moore offers no explanation.

*Sham affidavit rule does not apply to differences*
*between an expert report and an affidavit*

{¶74} Moore argues that the trial court's ruling striking Dr. Gubernick's affidavit under the sham affidavit doctrine does not apply to inconsistencies and/or contradictions between an expert report submitted under Civ.R. 26(B) and a later affidavit. According to Moore, the first sworn submission Dr. Gubernick made in this case was his affidavit. Moore characterizes the expert report submitted under Civ.R. 26(B) as an "unsworn report". (Moore's brief at 16).

{¶75} This argument is misplaced. First, Dr. Gubernick incorporated his expert report opinions into his sworn affidavit. "13. Based upon the above, I stand by my opinions listed in my November 16, 2022 report. Further specificity and additional opinions are as follows." (Plaintiff's Exh. 5 to Plaintiff's Opposition to Meniru motion for summary judgment, April 18, 2023.)

{¶76} Second, the purpose of exchanging expert witness reports under Civ.R. 26(B) is to prohibit an expert from testifying to any opinions that are not disclosed in their report. "An expert will not be permitted to testify or provide opinions on matters not disclosed in his or her report." Civ.R. 26(B)(7)(c).

{¶77} As noted by appellee, the Staff Notes to Civ.R. 26(B)(7) set forth the rationale for requiring expert reports to learn the opinions of opposing party's expert to lessen the time and significant expense associated with expert discovery including depositions.

{¶78} In short, at minimum, Dr. Gubernick incorporated his expert report in his sworn affidavit attached to Moore's response to Meniru's motion for summary judgment. Accordingly, it is not an "unsworn report" as alleged by Moore.

*Expert Report of Dr. Gubernick and Affidavit in*
*Response to Summary Judgment are not inconsistent*

{¶79} Moore argues that the expert report of Dr. Gubernick is not inconsistent with his affidavit because he opines in the expert report that Meniru "deviated from good and acceptable practice by not advocating for a c-section in the evening of 5-28-2015." But a reading of the expert report does not fault Meniru alone, but is a blanket and sweeping conclusion that all health care providers breached the standard of care. "Dr. Domingo, Dr. Meniru, the nursing staff all deviated from good and acceptable practice by not advocating for a c section in the evening of 5-28-2015." (Exh. 2 to Plaintiff's Exh. 5, Plaintiff's Opposition to Meniru motion for summary judgment, April 18, 2023.) The expert report does not definitively fault Meniru alone for any breach of standard of care on May 28, 2015. There is no testimony or evidence that Meniru was even around the evening of May 28, 2015. By all accounts, he was not the attending physician of Moore on May 28, 2015.

{¶80} Instead, Dr. Gubernick's affidavit explicitly offered a contrary opinion in an effort to avoid summary judgment; namely a caesarian section on May 29, 2015 within thirty minutes of notification of fetal distress.

{¶81} In short, Moore argues the standard of care was breached on the evening of May 28, 2015 or alternatively on the morning of May 29, 2015. It is not reasonable, as Moore claims, for jurors to conclude that the standard of care "at either moment would have prevented an injury that had not yet occurred." (Moore's brief at 19).

**{¶82}** Accordingly, we find that Moore has offered no reasonable explanation for the inconsistent opinion offered by her expert in his April, 2023 affidavit. The trial court did not abuse its discretion in striking the affidavit of Dr. Gubernick attached to appellant's opposition to Meniru's motion for summary judgment. The first assignment of error is overruled.

### II. Granting of Summary Judgment to Meniru was not error

*Standard for Summary Judgment*

**{¶83}** After the trial court struck the affidavit of Dr. Gubernick attached to Moore's response, the trial court found that "no expert testimony exists to show that Dr. Meniru breached the standard of care that caused or contributed to [P.C.M.'s] injuries. It granted Meniru' s motion for summary judgment finding no material issue of fact remains as to the claims against Defendant Meniru ..." (Judgment Entry, June 25, 2023 at 3).

**{¶84}** In her second assignment of error, Moore contends that the trial court erred in granting Meniru' s motion for summary judgment because even without Dr. Gubernick's affidavit, she presented sufficient evidence demonstrating that there were issues of fact regarding Meniru' s role in the labor and delivery of P.C.M.

**{¶85}** To illustrate that genuine issues of facts remain, Moore points to Dr. Gubernick's expert report that Dr. Domingo, Dr. Meniru and the nursing staff all breached the standard of care by not "advocating" for a caesarian by 7:00 pm on May 28, 2015.

**{¶86}** Moore also points to Meniru's deposition testimony pp. 92-93 and the medical records that demonstrate Meniru's presence at the hospital at 4:46 pm on May 28, 2015. Moore claims that the presence of Meniru at 4:36 created issues of fact that

Meniru violated the standard of care for "jurors to sort out." (Moore's brief at 24). We disagree.

**{¶87}** Appellate courts conduct a de novo review of trial court summary judgment decisions. *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105 (1996); *Lowrey v. Fairfield Med. Ctr.,* 2009-Ohio-4470, ¶ 44 (5th Dist.) ("Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court" citing *Smiddy v. The Wedding Party, Inc.,* 30 Ohio St.3d 35, 36 (1987). The *Pettiford* Court explained the purpose of summary judgment:

> In answering the certified question, we were mindful of the purpose of summary judgment. We recognized that the procedure set forth in Ohio Civ.R. 56 is modeled after the corresponding federal rule and observed that the federal rules are 'designed to secure the just, speedy and inexpensive determination of every action.
>
> ....
>
> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265.' *Pettiford,* 2010-Ohio-3237, at ¶ 21.

**{¶88}** Mere speculation and unsupported conclusory assertions are not sufficient to meet the nonmovant's reciprocal burden to set forth specific facts to show that a genuine

issue exists. *Knab v. Washington County Board of Commissioners,* 2024-Ohio-1569, ¶ 38 (4th Dist.) (citations omitted).

*Elements of medical malpractice*

**{¶89}** It is well settled under Ohio law that in order to meet the burden of proof in a medical negligence claim, a plaintiff must show by a preponderance of the evidence (1) the standard of care recognized by the medical community; (2) the failure of the defendant-physician to meet that standard of care; and (3) a causal link between the negligent act and the injury sustained. *Bruni v. Tatsumi,* 46 Ohio St.2d 127 (1976). To establish these three elements, a plaintiff must provide competent medical expert opinion.

**{¶90}** Having reviewed the pleadings, the record and the filed deposition transcripts, and reading the evidence most favorably for the nonmoving party, we find no genuine material issues of fact that would require the denial of the motion for summary judgment.

**{¶91}** Dr. Gubernick's expert report of November, 2022 is simply a generic, sweeping claim that all medical providers breached their duty of care to Moore and P.C.M. It failed to offer opinion testimony on the specific manner in which Meniru breached the standard of care. Indeed, the report contains most of its criticism to the actions and/or inactions of Domingo.

**{¶92}** In short, there are no genuine issues of material fact in this case regarding Meniru's breach of the standard of care. Accordingly, the trial court did not err in granting summary judgment in favor of Meniru. The second assignment of error is overruled.

**CONCLUSION**

**{¶93}** Accordingly, we overrule appellant's assignments of error and affirm the judgment of the trial court.

By: Wise, J.

Gwin, P.J., and

Baldwin, J., concur.

JWW/kt 0624